[This opinion has been published in *Ohio Official Reports* at 84 Ohio St.3d 116.]

THE STATE EX REL. PIZZA, PROS. ATTY., APPELLANT, *v.* REZCALLAH, APPELLEE.

THE STATE EX REL. PIZZA, PROS. ATTY., APPELLANT, V. TERRELL, APPELLEE.

THE STATE EX REL. PIZZA, PROS. ATTY., APPELLANT, V. GONZALES, APPELLEE.

[Cite as *State ex rel. Pizza v. Rezcallah*, 1998-Ohio-313.]

*Torts—Nuisances—R.C. 3767.02, construed—R.C. 3767.06(A) violates Fourteenth Amendment Due Process Clause and Fifth Amendment Takings Clause of the United States Constitution and Section 19, Article I of the Ohio Constitution, when.*

1. R.C. 3767.02 does not require proof of knowledge of, acquiescence to, or participation in the creation or perpetuation of a nuisance in order to find an owner of a nuisance guilty of the civil offense of "maintaining a nuisance."

2. To the extent that R.C. 3767.06(A) requires a trial court, upon a finding of a nuisance, to issue an injunction closing property against its use for any purpose for one year, and to the extent that it allows release from such injunction only through the filing or renewal of a bond in the full value of the property, the statute violates the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section 19, Article I of the Ohio Constitution, when applied to an owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance. (*Lindsay v. Cincinnati* [1961], 172 Ohio St. 137, 15 O.O.2d 278, 174 N.E.2d 96, overruled.)

(Nos. 96-1894, 96-1895 and 96-1897—Submitted October 8, 1997—Decided December 9, 1998.)

APPEALS from the Court of Appeals for Lucas County, Nos. L-95-298, L-95-362 and L-95-363.

_____

{¶ 1} Three cases have been consolidated in this matter.  The facts of each case are as follows:

*Case No. 96-1894*

{¶ 2} Defendant-appellee Mary Rezcallah owns a residence at 1137½ N. Erie Street in Toledo.  She rented this residence to Heather Anderson during all times relevant to the case.

{¶ 3} The Toledo police began surveillance on the property in September 1995.  The investigation culminated in the purchase of $20 of suspected crack cocaine (through the use of a confidential informant).  A subsequent search on October 2, 1995 resulted in the seizure of $726, plastic baggies tied together, a scale, and razor blades.

{¶ 4} The following day, police mailed a letter to Rezcallah, informing her of the illegal drug activities at the residence.  Rezcallah did not receive this letter until October 13, 1995.  However, in the meantime, a neighbor told Rezcallah that police had been to the house.  Rezcallah went to the premises to discuss the matter with Anderson, who told Rezcallah that the police had found "nothing" during the search.

{¶ 5} Rezcallah contacted the police October 4, 1995, and was informed that no arrests were made but that some might be forthcoming.  Rezcallah also twice attempted to obtain a copy of the police report pertaining to the premises.  She was told the report was not ready or could not be found.

{¶ 6} Police again conducted surveillance on the residence, and on October 10, 1995 purchased $20 worth of suspected cocaine at the residence.  On October 13, Rezcallah received the police report the police had sent regarding the first investigation.  On the same day, Rezcallah met with her attorney and prepared

eviction papers. The eviction notice was served on Anderson on October 16 with a required departure date of October 19.

{¶ 7} On the 19th, the day Anderson was required to vacate the premises, the police executed a second search warrant, seizing 23.17 grams of crack cocaine, $316, plastic baggies, razor blades, a phony pop can, and an Ameritech caller identification instrument. On the same day, the state filed a Complaint to Abate a Nuisance against Rezcallah, and the trial court issued a temporary restraining order allowing the premises to be padlocked by the police.[1]

{¶ 8} The state requested preliminary and permanent injunctions. On October 31, 1995, the court entered judgment in favor of Rezcallah on the injunctions and dismissed the complaint in its entirety. In so doing, the court held that in order to obtain an abatement order pursuant to R.C. 3719.10 and 3767.02, it is necessary for the state to prove by clear and convincing evidence that the owner had knowledge of and either acquiesced to or participated in the nuisance. The Sixth District Court of Appeals affirmed.

*Case No. 96-1895*

{¶ 9} Defendant-appellee Gilbert Terrell owns the property at 1315 Ironwood Avenue in Toledo. At all times relevant to this case, Julius Jones was an occupant and uninvited user of that residence.

{¶ 10} Terrell invited Jones to live at his residence in August 1994. After one month, however, Terrell took his house key from Jones and asked him to leave.

---

1. The record indicates that the trial court issued a temporary restraining order allowing the police to padlock Rezcallah's property prior to any hearing on either the preliminary or permanent injunction. Though the issue was not directly raised on appeal, we note our concern with any prehearing padlocking of premises absent a showing of exigent circumstances. The United States Supreme Court has held that seizure of real property based on illegal drug activity is not an extraordinary circumstance justifying postponement of notice and hearing. "Unless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture.*" United States v. James Daniel Good Real Property* (1993), 510 U.S. 43, 62, 114 S.Ct. 492, 505, 126 L.Ed.2d 490, 508-509.

Jones did leave but kept returning to the house and breaking in when Terrell was not there. Terrell continuously filed criminal charges against Jones for breaking into his residence, installed an alarm system (which was stolen following the first police search), and reported Jones's illegal activities in an attempt to get him removed from the premises.

{¶ 11} Terrell was not able to permanently remove Jones from the premises and prior to the first police search had abandoned the residence, leaving it to Jones.

{¶ 12} In February 1995, Toledo Police Detective Jerry Gears received a complaint from an anonymous caller who informed him that drug sales were occurring at the Ironwood residence. Terrell had also reported Jones's illegal activities to the police both in person and over the phone. Based on these tips, the police had confidential informants purchase crack cocaine from the house on February 20 and March 7, 1995. The Toledo police executed a search warrant at the residence on March 12, 1995. The evidence they seized included forty-eight pieces of crack cocaine, one automatic revolver, cash, an Ohio driver's license, five shotgun shells, five or six .38 caliber shells, and two digital scales.

{¶ 13} Jones was arrested at the scene and was charged with aggravated trafficking, though he was never convicted. Terrell was not present at the residence when the search warrant was executed.

{¶ 14} Following this arrest Jones's illegal activities continued and Terrell again reported Jones to the Toledo police. Based upon the information supplied by Terrell, the police, using an informant, purchased $20 of crack cocaine from the residence. Based upon that purchase, the Toledo police executed a second search warrant on the premises on May 22, 1995. They seized crack cocaine weighing 2.2 grams. Jones again was present, and was arrested and charged with third-degree felony drug abuse. He was never convicted. Terrell was not present at the residence at the time of the search.

{¶ 15} It is undisputed that Terrell assisted police in their investigation of the illegal activity at the residence. He contacted the police both in person and by telephone to inform them that drug activities were occurring at the residence.

{¶ 16} The trial court issued a temporary injunction, finding the residence to be a nuisance. The police padlocked the premises.

{¶ 17} Following a hearing on the issuance of a permanent injunction, the trial court entered judgment dissolving the preliminary injunction, ordering removal of the padlock, and denying the state's motion for permanent injunction. The trial court found that Terrell had fully cooperated with the police in abating the nuisance, and that he had not acquiesced to or participated in felony drug sales on the property. The Sixth District Court of Appeals affirmed the decision of the trial court.

*Case No. 96-1897*

{¶ 18} Defendant-appellee Teresa Gonzales (now Boardman) owns the property at 953 Butler Street in Toledo. Her brother, John Kochanski, was the occupant of that residence at all times relevant to this case.

{¶ 19} Toledo police executed a search warrant on the residence on April 15, 1994, after a telephone complaint about drug sales, surveillance, and a purchase of $20 of crack cocaine from the residence by a confidential informant. The police seized marijuana, two crack pipes and another item of drug paraphernalia, and a telephone bill. Kochanski, at the time of the search, was arrested on charges of drug abuse and possession of drug paraphernalia.

{¶ 20} On September 10, 1994, following another complaint by neighbors and further surveillance, an undercover officer made two purchases of crack cocaine from the residence. Kochanski was present at, and orchestrated, both sales. Based upon the sales, Kochanski was arrested on two counts of aggravated trafficking. Two of Kochanski's cohorts, Keith Douglas and Tammy Holder, were

also arrested, and a third, Regina Williams, was indicted, all on charges of aggravated trafficking.  Gonzales was never present for any drug sales.

{¶ 21} Detective Delaney sent a letter dated April 22, 1994 to the residence, addressed to Gonzales, to notify her that drug sales were occurring on her property and what the consequences would be should the activities continue.  Gonzales testified that she never saw the letter, and that she did not learn of the execution of the search warrant until June 1994.  At that time she warned Kochanski that she would evict him if there was another incident.  Gonzales also testified that she did not know of the September 1994 arrests, and that she never visited the residence after the execution of the search warrant on April 15, 1994.  Detective Delaney testified that the residence had the reputation of being a crack house.

{¶ 22} The state subsequently filed a Complaint to Abate a Nuisance pursuant to R.C. Chapter 3767.  The trial court entered judgment in favor of Gonzales.  The Sixth District Court of Appeals affirmed the trial court.

{¶ 23} The cases are before this court upon the allowance of discretionary appeals.

_____

*Julia R. Bates*, Lucas County Prosecuting Attorney, *Steven J. Papadimos* and *Bertrand R. Puligandla*, Assistant Prosecuting Attorneys, for appellant.

*Barkan & Robon* and *Cynthia G. Tesznar*, for appellee Mary Rezcallah.

*Gilbert Terrell*, *pro se*.

*Wesley M. Miller, Jr.*, for appellee Teresa Gonzales.

*Betty D. Montgomery*, Attorney General, *Jeffrey S. Sutton*, State Solicitor, and *Simon B. Karas*, Assistant Attorney General, urging reversal for *amicus curiae,* Ohio Attorney General.

_____

**MOYER, C.J.**

**{¶ 24}** In each of the three cases before us a non-owner resident was arrested for conduct that violated felony drug laws while occupying residential property owned by one of the appellees herein. In all three cases, it is undisputed that the appellee property owners neither acquiesced to nor participated in the drug activities that took place on their property. Further, the record indicates that all three owners acted in good faith, taking affirmative action to investigate allegations and to remove the offending residents upon discovering the illegal activity. The state nonetheless filed a Complaint to Abate a Nuisance, pursuant to R.C. Chapter 3767, against each owner.

**{¶ 25}** Two questions are presented. First, we must determine whether R.C. 3767.02 requires a finding of acquiescence to or participation in the establishment or perpetuation of a nuisance as a necessary element in a civil action against a property owner for maintaining a nuisance. Second, we must determine whether, in the absence of such a requirement, the enforcement of the nuisance abatement statutes of R.C. Chapter 3767 against an innocent property owner is constitutional.

**{¶ 26}** In answering the first question, we hold that R.C. 3767.02 does not require a finding of acquiescence to or participation in the creation or perpetuation of a nuisance on an owner's property in order to find an owner guilty of maintaining a nuisance. As to the second question, we hold that to the extent that R.C. 3767.06(A) requires a trial court, upon a finding of a nuisance, to issue an injunction closing property against its use for any purpose for one year, and to the extent that it allows release from such injunction only through the filing or renewal of a bond in the full value of the property, the statute violates the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section 19, Article I of the Ohio Constitution, when applied to an owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance.

I

Statutory Scheme

{¶ 27} R.C. 3767.02 provides that "[a]ny person who uses, occupies, establishes, or conducts a nuisance * * *, *and the owner* * * * of any interest in such nuisance * * * *is guilty of maintaining a nuisance* and *shall be enjoined* as provided in sections 3767.03 to 3767.06, inclusive, of the Revised Code." (Emphasis added.) A nuisance can be proven either by admission or establishment in a civil action as provided for in R.C. 3767.03, or by a finding of guilt in a criminal action that establishes a nuisance. R.C. 3767.06; 3767.11.

{¶ 28} Further, R.C. 3719.10 provides that "[p]remises or real estate, including vacant land, on which a felony violation of Chapter 2925. [criminal drug offenses] or 3719. [Uniform Controlled Substances Act] of the Revised Code occurs constitute a nuisance subject to abatement pursuant to Chapter 3767. of the Revised Code."

{¶ 29} Whenever a nuisance is thought to exist, an action may be brought under R.C. 3767.03 "to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it." At the same time, the complainant may file an application for a temporary injunction pursuant to R.C. 3767.04. If, following a hearing, the judge is satisfied that the allegations of the complaint are sustained, and unless the owner or person in control of the nuisance has satisfied the court that the nuisance has been abated or that the owner acted immediately to enforce his or her rights under R.C. 3767.10,[2] the court shall issue an order closing the place against its use for any purpose of "lewdness, assignation, prostitution, *or other prohibited conduct*" until a final decision has been reached on the complaint. (Emphasis added.) R.C. 3767.04(B)(3).

_____

2. R.C. 3767.10 voids any lease or other title held by a tenant or occupant when the property is used for "purposes of lewdness, assignation, or prostitution." This statute does not create an automatic right of eviction when a tenant or occupant uses the property to conduct drug activities. Thus, a landlord is bound under the law to follow normal eviction proceedings as outlined in R.C. 1923.02 and R.C. 5321.03.

{¶ 30} The scope of this temporary closure order is limited to the prevention of prohibited activity and does not authorize the court to order an "effectual closing * * * against its use for any purpose" (R.C. 3767.06[A] ) via padlocking or otherwise. Even if the conditions for issuance of a temporary closure order have been met, the court may refrain from entering a closure order or may discharge an order already entered if the owner posts a bond for the full value of the property and fulfills the other requirements listed in R.C. 3767.04(C).

{¶ 31} Thereafter, the existence of a nuisance is to be determined "upon the trial of [a] civil action," and, if the existence of a nuisance is admitted or established in that civil action, the court "shall" enter judgment that "perpetually enjoins the defendant and any other person from further maintaining the nuisance at the place complained of and the defendant from maintaining the nuisance elsewhere." R.C. 3767.05(D). R.C. 3767.06(A) also requires that "an order of abatement shall be included in the judgment entry." Because both R.C. 3767.05(D) and 3767.06(A) use the imperative word "shall," these provisions are deemed mandatory.

{¶ 32} Pursuant to R.C. 3767.06(A), where the owner has not provided a bond prior to the trial on the merits, and where no prior closure order was issued against use of the property, the order also "shall" direct closure of the real property against use for any purpose for one year. R.C. 3767.06(A) reads in part: "The order also shall require the renewal for one year of any bond furnished by the owner of the real property under section 3767.04 of the Revised Code; if a bond was not so furnished, shall continue for one year any closing order issued at the time of granting the temporary injunction; or, if a closing order was not then issued, shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released."

{¶ 33} Whenever a permanent injunction issues against an owner of real property for maintaining a nuisance, a three hundred dollar tax shall also be

imposed. R.C. 3767.08. The tax, however, may not be imposed if at the time the permanent injunction is issued, the owner satisfies the court that the nuisance complained of has been permanently abated. R.C. 3767.08.

## II

### Statutory Interpretation

{¶ 34} R.C. 3767.02, which defines the offense of maintaining a nuisance, is clear and unambiguous and does not include a requirement of knowledge, acquiescence, or participation on the part of an owner of the property deemed to be a nuisance. We thus hold that R.C. 3767.02 does not require proof of acquiescence to or participation in the creation of a nuisance or the conduct constituting a nuisance in order to find an owner of a nuisance guilty of the civil offense of "maintaining a nuisance."

{¶ 35} Proof of an owner's knowledge, acquiescence, or participation is relevant, however, in determining which statutory remedies may be imposed once the owner is found guilty of maintaining a nuisance. Because R.C. Chapter 3767 provides exceptions to the imposition of a temporary closing order at the preliminary injunction stage, and prevents imposition of a tax against property owners who have abated the nuisance prior to the completion of the civil action, these remedies may not be applied against an innocent owner who has acted in good faith and has abated the nuisance prior to the commencement of the civil action.

{¶ 36} To the contrary, the provisions of R.C. 3767.06 provide no exceptions by which a good-faith owner of real property may avoid an order of abatement, a permanent injunction against further maintaining the nuisance, or either the continuance of a closure order already in effect or a mandatory one-year "effectual closing" of property against all uses where no bond was previously provided by the owner and no prior closure order was issued. Under the statutory scheme these orders must issue irrespective of whether a defendant property owner

acquiesced to or participated in the creation or perpetuation of the nuisance and irrespective of whether the nuisance has been abated.

{¶ 37} We have previously held that "it would be inappropriate to balance the equities or require the [state] to do equity in [a statutory] * * * injunction action because * * * injunctions which authorize a governmental agent to sue to enjoin activities deemed harmful by the General Assembly are not designed primarily to do justice to the parties but to prevent harm to the general public." *Ackerman v. Tri-City Geriatric & Health Care* (1978), 55 Ohio St.2d 51, 57, 9 O.O.3d 62, 66, 378 N.E.2d 145, 149. *Ackerman* clearly states that "statutory injunctions should issue if the statutory requirements are fulfilled." *Id.* at 57, 9 O.O.3d at 66, 378 N.E.2d at 149.

{¶ 38} Accordingly, the trial courts in the cases before us erred in dismissing the complaints alleging maintenance of a nuisance on the grounds that the state was unable to prove that the owners had knowledge of, acquiesced to, or participated in a nuisance on their property. The General Assembly has provided that if a nuisance, as defined in R.C. 3719.10 or 3767.01(C), was admitted or established under R.C. 3767.11 or 3767.03, the courts were statutorily required to enter a judgment entry, including an order of abatement and a permanent injunction against the owners irrespective of their degree of culpability in the creation or perpetuation of the nuisance.

{¶ 39} As discussed below, however, we hold that the imposition of a mandatory closure order pursuant to R.C. 3767.06(A) would be unconstitutional as applied to these defendants.

III

Constitutionality of R.C. Chapter 3767 — Federal Constitution

{¶ 40} We find no constitutional infirmity in those portions of R.C. Chapter 3767 that grant the court discretion in the imposition of various remedies. We further find that there is no constitutional bar to the mandatory imposition of an abatement order or a permanent injunction barring the defendant from "further maintaining the nuisance at the place complained of" pursuant to R.C. 3767.05(D) and 3767.06. However, to the extent that R.C. 3767.06(A) mandates the imposition of a closure order directing the effectual closing of the place where a nuisance is found to exist against its use for any purpose for a period of one year, or requires the filing or renewal of a bond in lieu of such a closure order, when the owner of the property bears no culpable responsibility in the nature of acquiescence to or participation in the creation or perpetuation of the nuisance, the statute violates the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section 19, Article I of the Ohio Constitution.

{¶ 41} It bears emphasis that R.C. 3767.06(A) mandates the issuance of an order directing the closure of property upon which a nuisance has been maintained against its use for *any purpose*. The statute does not allow for judicial discretion in the imposition of the order, nor does it require proof of any knowledge or culpability on the part of the property owner before it may be imposed. Release from the closure order may be obtained only where the owner files a bond for the *full value* of the property, *and* pays all costs, *and* the owner immediately abates the nuisance, *and* if the court is satisfied of the owner's good faith. R.C. 3767.04(C).

{¶ 42} A forfeiture is "a divestiture of specific property without compensation; it imposes a loss by the taking away of some preexisting valid right without compensation." Black's Law Dictionary (6 Ed.1990) 650. An order to close property "against its use for any purpose," as mandated by R.C. 3767.06(A),

renders the owner's property economically idle for a year. In *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798, 815, the court noted that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." (Emphasis in original.) The fact that the order is of limited duration does not change this conclusion. It is well established that the Constitution protects against temporary takings just as it does against permanent takings. *First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles* (1987), 482 U.S. 304, 318, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250, 266.

{¶ 43} Nor is the closure-order provision saved from constitutional infirmity by the availability of judicial release through the filing of a bond in the full value of the property. Deprivation of the use of resources equal to the value of the property is as much a taking as is deprivation of the use of the property itself. Further, as argued by appellee Rezcallah, an innocent owner defendant may often be financially incapable of filing such a bond. Accordingly, we hold that padlocking an owner's property, effectively closing it against all uses for a year, is a taking, albeit temporary in nature. The constitutional analysis therefore is the same for seizures resulting in a temporary closure order as it is for those resulting in a permanent forfeiture. See *id*.

{¶ 44} We acknowledge that not all forfeitures or temporary takings without compensation are constitutionally infirm. The United States Supreme Court has held in a long line of cases that a state may use its police power to enjoin a property owner from activities akin to public nuisances without offending either the Due Process or Takings Clause. This court has also upheld the validity of forfeitures and closure orders resulting from nuisance abatement actions. However, we find these Ohio cases to be of limited usefulness in determining the issues now before us.

{¶ 45} In *Gabriel Bldg. Co. v. State ex rel. Birrell* (1932), 125 Ohio St. 642, 186 N.E. 5, we upheld similar closure provisions against federal constitutional challenges. *Gabriel*, however, is not controlling here because there is no indication that *Gabriel* involved a padlock order imposed against an innocent or good-faith owner of property. Similarly, *State ex rel. Miller v. Anthony* (1995), 72 Ohio St.3d 132, 647 N.E.2d 1368, is not controlling because the owner in that case created the nuisance by selling drugs from his own residence.

{¶ 46} In *Lindsay v. Cincinnati* (1961), 172 Ohio St. 137, 15 O.O.2d 278, 174 N.E.2d 96, we decided a case which did involve the forfeiture of an innocent owner's property. However, upon reviewing that decision, we now reject its reasoning, and overrule it.

{¶ 47} In *Lindsay,* the court relied on a misinterpretation of the earlier United States Supreme Court decision in *Grosfield v. United States* (1928), 276 U.S. 494, 48 S.Ct. 329, 72 L.Ed. 670. In *Lindsay*, the court incorrectly determined that "[t]he constitutionality of such statutory provisions has been upheld by the Supreme Court of the United States in *Grosfield v. United States* * * * which was followed in *Gabriel* * * *." *Lindsay* at 141, 15 O.O.2d at 280, 174 N.E.2d at 99.

{¶ 48} We reject this rationale for two reasons. First, *Grosfield* was based on an assumption that the padlocking order affecting the property was *not* imposed upon an "innocent" owner. Second, the court in *Grosfield* did not decide the constitutionality of the federal statute before it.

{¶ 49} The court in *Grosfield* specifically stated that "[t]he only question for our consideration is whether the evidence submitted to the district court is sufficient to justify the [padlock order]." *Grosfield*, 276 U.S. at 496, 48 S.Ct. at 330, 72 L.Ed. at 671. The court repeatedly emphasized that its decision was limited to the facts before it, and based its holding on a determination that there was sufficient evidence to support a finding of knowledge and acquiescence on the part

14

of the property owner, and that the owner failed to take prompt action to abate the nuisance. *Grosfield* at 498-499, 48 S.Ct. at 331, 72 L.Ed. at 672.

{¶ 50} Moreover, even under those facts, the *Grosfield* court limited its affirmance of the padlock order to situations where "the evidence furnish[es] reasonable ground for apprehending a repetition of such use." *Grosfield* at 498, 48 S.Ct. at 331, 72 L.Ed. at 672. Thus, *Lindsay*'s reliance on *Grosfield* in upholding the constitutionality of a forfeiture imposed against an innocent owner is misplaced. Consequently, we overrule *Lindsay* and look directly to precedent established by the United States Supreme Court.

{¶ 51} The law regarding seizures and forfeitures of property has received growing judicial attention in recent years, based, at least in part, on its increased governmental use. Though the federal courts have upheld forfeiture statutes even as applied to innocent owners in a variety of contexts, they have also consistently recognized in dicta or by express reservation of comment that there are factual situations in which forfeitures exercised against innocent owners will be held to violate constitutional standards. We believe that the three cases before us present such facts, and the application of the "effectual closing" provision of R.C. 3767.06(A) under these circumstances would constitute an unconstitutional seizure and forfeiture of property in violation of the federal Takings Clause and Due Process Clause.

{¶ 52} One of the questions that has been continually reserved in recent cases is whether it would be constitutionally permissible to seize property when the owner is without fault *and* did not consent to *any* use of the property by the offending third party. Though the question has not been addressed by recent cases, the United States Supreme Court held in *Peisch v. Ware* (1808), 8 U.S. 347 (4 Cranch 347), 2 L.Ed. 643, that trespassers' acts cannot serve as the basis for a valid forfeiture of goods "[i]f, by private theft, or open robbery, without any fault on his [owner's] part, his property should be invaded * * *." *Id.* at 364, 2 L.Ed. at 648.

15

This principle has been reinforced in dicta in more recent forfeiture cases. See, *e.g.*, *Austin v. United States* (1993), 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488.

**{¶ 53}** We follow the dictates of *Peisch* and hold that it is dispositive in one of the three cases before us. In case No. 96-1895, *State ex rel. Pizza v. Gilbert Terrell*, a criminal trespasser invaded the defendant's property and used that property to conduct illegal activities. The owner was without fault and did not consent to *any* use of his property by the third-party trespasser.

**{¶ 54}** While *Peisch* is dispositive in Terrell's case, we must look further to determine the constitutionality of applying R.C. 3767.06(A) to Gonzales and Rezcallah. Both Gonzales and Rezcallah consented to some use of their property by the offending third party, though they did not acquiesce to or participate in the specific use that created the nuisance.

**{¶ 55}** In all three cases, the state relied on *Bennis v. Michigan* (1996), 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68, a recently decided United States Supreme Court decision, in support of its contention that all provisions of R.C. Chapter 3767 are constitutional even as applied to innocent or good-faith property owners. In *Bennis*, the court upheld the forfeiture of a vehicle owned by John Bennis and his wife. The vehicle had been used as the site of lewd activities between Bennis and a prostitute. Mrs. Bennis, a wholly innocent party, and co-owner of the vehicle, challenged the constitutionality of the taking of her interest in the property by the state of Michigan without compensation. The court held that the Michigan abatement statute, which commanded the forfeiture of vehicles deemed to constitute a nuisance regardless of the owner's knowledge of or acquiescence in the conduct creating the nuisance, did not violate the due process provisions of the Fourteenth Amendment, nor did not it constitute a taking of private property for public use without compensation in violation of the Fifth Amendment.

**{¶ 56}** Our analysis of the decision in *Bennis* causes us to conclude that it is not controlling in the cases before us, for the following reasons:

16

**{¶ 57}** 1. Mrs. Bennis conceded that the car she owned with her husband was subject to forfeiture. She argued only that she should be compensated for her interest. Thus, the court was not required to evaluate the propriety of the forfeiture itself. See *Bennis* at 453, 116 S.Ct. at 1001, 134 L.Ed.2d at 79 (Thomas, J., concurring).

**{¶ 58}** 2. In *Bennis*, the court emphasized that the Michigan nuisance abatement proceedings were equitable in nature, and that the trial court had discretion to implement, or refuse to implement a forfeiture in any given case. *Id.* at 452, 116 S.Ct. at 1000, 134 L.Ed.2d at 78; see, also, *Bennis* at 457-458, 116 S.Ct. at 1003, 134 L.Ed.2d at 82 (Ginsburg, J., concurring) ("[T]he [Michigan] Supreme Court stands ready to police exorbitant applications of the statute. * * * Michigan, in short, has not embarked on an experiment to punish innocent third parties. Nor do we condone any such experiment." [Citations omitted.]).

**{¶ 59}** R.C. 3767.03 describes the nuisance abatement proceedings authorized by R.C. Chapter 3767 as being equitable in nature, as did the Michigan statute at issue in *Bennis*. However, unlike Michigan law, Ohio law leaves a trial court no discretion in imposing closure orders upon finding the existence of a nuisance. As discussed, *supra*, we have previously held that statutory injunctions should issue without regard to traditional equitable considerations if statutory requirements are fulfilled. See *Ackerman v. Tri-City Geriatric & Health Care*, 55 Ohio St.2d at 57, 9 O.O.3d at 66, 378 N.E.2d at 149. Thus, in Ohio, although R.C. 3767.03 authorizes the filing of an "action in equity," R.C. 3767.06(A) makes the padlock order a mandatory part of any abatement order, and a trial court has no discretion to curtail exorbitant applications of the statute on a case-by-case basis.

**{¶ 60}** Because the existence of judicial discretion to determine whether a forfeiture was justified was important to the majority in *Bennis*, and because the Ohio statutory framework before us allows for no similar exercise of discretion, *Bennis* does not compel a holding that Ohio's R.C. 3767.06 is constitutional.

**{¶ 61}** 3. Mrs. Bennis made no showing that she took any affirmative actions to prevent the use of her vehicle for illegal purposes, or to abate illegal uses. In contrast, there is evidence to suggest that Rezcallah, Gonzales, and Terrell all took affirmative actions to determine whether illegal activity was occurring, to notify and/or cooperate with police in investigating and terminating the illegal activities, and to use legal means available to them to remove the offenders from the property and abate the nuisance in a timely fashion.

**{¶ 62}** In *Calero-Toledo v. Pearson Yacht Leasing Co.* (1974), 416 U.S. 663, 689, 94 S.Ct. 2080, 2094-2095, 40 L.Ed.2d 452, 471, the court stated that "it would be difficult to reject the constitutional claim of * * * an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." Where there is "no intentional wrongdoing, no departure from any prescribed or known standard of action, and no reckless conduct" and where the owner was not entirely "free to act or not, as it chose" because of legal and practical considerations, such as requirements of eviction law and the limits on self-help potentials in evicting a criminal trespasser, infliction of a penalty is "so plainly arbitrary and oppressive as to be nothing short of a taking of [his/her] property without due process of law." *Southwestern Tel. & Tel. Co. v. Danaher* (1915), 238 U.S. 482, 490-491, 35 S.Ct. 886, 888, 59 L.Ed. 1419, 1422.

**{¶ 63}** The records in these cases support a finding that each of the three defendants not only remained uninvolved in and originally unaware of the wrongful activity, but took reasonable measures to stop the proscribed use of his or her property upon discovering it. In fact, it is difficult to conceive of additional measures the defendants could have legally and safely taken which could have prevented or more quickly put an end to the illegal activities.

{¶ 64} 4. The remedial purposes purportedly served by the forfeiture in *Bennis* are not served by an order padlocking the real property of an innocent owner against all purposes for a year.

{¶ 65} The *Bennis* court recognized the "considerable appeal" of the argument that application of a forfeiture statute against an innocent owner is unfair. It concluded, however, that the force of that argument was reduced by the remedial effect of the Michigan forfeiture law. *Bennis*, 516 U.S. at 453, 116 S.Ct. at 1001, 134 L.Ed.2d at 79. Justice Thomas noted that sale proceeds from the forfeited car served the remedial goal of paying the state's costs in the matter. *Bennis* at 456, 116 S.Ct. at 1002-1003, 134 L.Ed.2d at 81, fn. (Thomas, J., concurring).

{¶ 66} In contrast, a closure order issued pursuant to R.C. 3767.06(A), generates no revenue or compensation for state costs. Where forfeiture does not compensate the government for a loss, the forfeiture does not serve a remedial purpose. *United States v. Bajakajian* (1998), 524 U.S. 321, ___, 118 S.Ct. 2028, 2034, 141 L.Ed.2d 314, 326 (citing Black's Law Dictionary [6 Ed.1990] 1293, and *One Lot Emerald Cut Stones v. United States* [1972], 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438). Thus, the remedial goals served by the forfeiture in *Bennis* simply do not exist in the cases at hand where the mandatory one-year closure order established by R.C. 3767.06(A) would be imposed against an innocent owner who has already abated the nuisance.

{¶ 67} Having determined that *Bennis* is not controlling here, we must independently analyze the question under the general principles of forfeiture law.

{¶ 68} The United States Supreme Court has held in a long line of cases that the state may use its police power to enjoin a property owner from activities akin to public nuisances without offending either the Due Process Clause or Takings Clause. These cases were reviewed and clarified in *Lucas*. " '[L]and use regulation does not effect a taking [under the federal Constitution] if it "substantially advance[s] legitimate state interests" * * *.' " *Lucas* at 1024, 112 S.Ct. at 2897,

120 L.Ed.2d at 818 (citing *Nollan v. California Coastal Comm.* [1987], 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677, 687).

{¶ 69} The state argues that the mandatory closure and bonding provisions of R.C. 3767.06(A) advance the state's interest in protecting the public from illegal drug activity by providing incentive to a property owners to actively monitor their property, and to prevent the recurrence of felony drug transactions on their property. There is no question that the prevention of illegal drug activity is a legitimate state interest. We hold, however, that the mandatory closure provisions of R.C. 3767.06(A) do not substantially advance this interest when imposed against property owners who have not acquiesced to or participated in the illegal activity, and who have promptly abated the nuisance upon its discovery.

{¶ 70} Even if a landlord did undertake to monitor his or her property, the mere act of surveillance is unlikely to generate any information that would provide sufficient grounds for eviction. Landlords are limited in the actions they may take against tenants engaged in illegal activities both by law and practical considerations. They are statutorily prohibited from entering leased residential property unannounced. See R.C. 1923.02 and 5321.03. While R.C. 3767.10 purports to authorize an owner to immediately enter leased premises without process of law where the premises are used for "purposes of lewdness, assignation or prostitution," the General Assembly has not authorized immediate entry when the premises are being used to conduct illegal drug activities. Even if the statute did contain such an authorization, and assuming a landlord was able to gather enough evidence to prove his or her suspicions, it is unrealistic to expect a landlord to subject himself or herself to the risk of possible injury inherent in an attempt to unilaterally dispossess tenants who may be under the influence of drugs and may be armed.

{¶ 71} Landlords have no authority to conduct regular drug searches, nor may they break a lease based solely on unsubstantiated suspicions that the tenant is

20

conducting illegal activities. Moreover, landlords have no reliable way of predicting which, if any, prospective tenants may later become involved in illegal drug activities on the landlord's property. Appellee Rezcallah persuasively argues that even without these legal restrictions, her limited resources for investigating or acting upon any suspicion of drug activity on her property make her "no match for the illegal drug trade."

{¶ 72} It is unclear what action the landlord could or should take to avoid forfeiture. The state is apparently not satisfied if the owner informs the police of the illegal activity or files criminal charges against the resident, as defendant Terrell had done. It apparently is not enough to initiate eviction proceedings, as defendant Rezcallah had done. Nor was the state satisfied with defendant Gonzales's attempt to investigate allegations of drug activity on her own. Once the state had information that illegal drug activities had taken place on the property, it had without regard to the owners' efforts at investigation, reporting, or abatement, attempted to padlock their property. Hence, if owners report a tenant to the police and cooperate with them in investigating and prosecuting the tenant, thereby ending the illegal activity through appropriate and legal means, they have effectively admitted that the property is a nuisance and subjected themselves to the mandatory padlocking provisions of R.C. 3767.06(A). Rather than substantially advancing the goal of encouraging property owners to monitor their property and take all legal steps to abate illegal activities thereon, this provision may actually discourage owners from reporting illegal activity.

{¶ 73} An additional effect of padlocking the property is that the owner is precluded from maintaining or repairing the property after the offending party has left the premises. This creates an increased risk that the property will further deteriorate and again become a nuisance. These effects and considerations undercut the state's argument that the mandatory closure provision of R.C. 3767.06(A) substantially furthers the goal of prevention and speedy abatement of

nuisances.  We conclude that the imposition of a closure order pursuant to R.C. 3767.06(A) effectively closing  real property against its use for any purpose for a period of one year does not advance a legitimate state interest when enforced against an innocent owner and that the state's interest does not outweigh the owner's interest in the economic use of his or her property.  Therefore, the mandatory closure order provisions of R.C. 3767.06(A) violate the Takings Clause of the Fifth Amendment to the United States Constitution when imposed against an innocent owner.

{¶ 74} Further, we hold that because there is no intentional wrongdoing, no departure from any prescribed standard of action, and no reckless conduct, and because landowners are not completely free to act as they choose due to landlord-tenant laws and other limitations on self-help evictions, forfeiture under these circumstances is so arbitrary and oppressive as to be a taking without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

IV

Ohio Constitution

{¶ 75} We hold as a separate and independent basis for our decision that the mandatory closure-order provision of R.C. 3767.06(A) is unconstitutional as applied to these defendants under Section 19, Article I of the Ohio Constitution, which provides that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare."

{¶ 76} We begin our state-law analysis by reaffirming the premise that the law does not favor forfeiture.  See, *e.g.*, *State v. Lilliock* (1982), 70 Ohio St.2d 23, 25-26, 24 O.O.3d 64, 65-66, 434 N.E.2d 723, 725.  "The law requires that we favor individual property rights when interpreting forfeiture statutes."  *Ohio Dept. of Liquor Control v. Sons of Italy Lodge 0917* (1992), 65 Ohio St.3d 532, 534, 605 N.E.2d 368, 369.

**{¶ 77}** Private property rights may be limited through the state's exercise of its police power when restrictions are necessary for the public welfare. Just as private property rights are not absolute, however, neither is the state's ability to restrict those rights. Before the police power can be exercised to limit an owner's control of private property, it must appear that the interests of the general public require its exercise and the means of restriction must not be unduly oppressive upon individuals. *Froelich v. Cleveland* (1919), 99 Ohio St. 376, 124 N.E. 212. Further, the free use of property guaranteed by the Ohio Constitution can be invaded by an exercise of the police power only "when the restriction thereof bears a substantial relationship to the public health, morals and safety." *State ex rel. Kahler-Ellis Co. v. Cline* (C.P.1954), 69 Ohio Law Abs. 305, 309, 125 N.E.2d 222, 225.

**{¶ 78}** The mandatory closure provision of R.C. 3767.06(A) fails these requirements. We have already explained in the context of the United States Constitution that the restrictions imposed by this statute do not substantially advance the state's interest in preventing and abating illegal activities and that they may even serve to produce the opposite effect. For the same reasons, we now hold that the mandatory closure-order provision in R.C. 3767.06(A), closing the property against any use, including maintenance by the owner or any other legal use, bears no substantial relationship to the public health, morals, and safety.

**{¶ 79}** The closure provisions also fail for being unduly oppressive against an individual owner. Where an owner is subject to closure of property against all purposes for a year solely on the basis of the illegal acts of a third party over whom the owner has no legal means of control, the closure order is unduly oppressive. This is especially true where that owner has taken affirmative actions to proceed by reasonable means to prevent the third party from continuing the illegal acts. Therefore, the mandatory closure-order provision of R.C. 3767.06(A) is an improper exercise of police power under Section 19, Article I of the Ohio

Constitution when it is imposed and enforced against a property owner who lacks any culpability in the creation or perpetuation of a nuisance on the property.

V

{¶ 80} For the foregoing reasons, we reverse the judgments of the court of appeals and remand these causes to the trial courts for disposition consistent with this opinion. The trial courts are to determine whether, without regard to the knowledge, acquiescence, or participation of the defendant owners, the owners are guilty of maintaining a nuisance as defined in R.C. 3767.02. If any owner is found guilty of maintaining a nuisance, as per the statute, the trial court shall impose an abatement order and permanent injunction in accordance with R.C. 3767.06. However, if, despite a finding of guilt, the court determines that a defendant owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance, no closure order shall be issued under R.C. 3767.06(A) and no tax shall be imposed pursuant to R.C. 3767.09.

*Judgments reversed*

*and causes remanded.*

F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

FORD, J., concurs in part and dissents in part.

COOK, J., concurs in part and dissents in part.

DOUGLAS, J., dissents.

DONALD R. FORD, J., of the Eleventh Appellate District, sitting for RESNICK, J.

_____

**FORD, J., concurring in part and dissenting in part.**

{¶ 81} Although I concur with the well-reasoned rationale of the majority opinion with respect to the second paragraph of the syllabus, I must respectfully dissent with regard to the analysis and conclusion of the first paragraph of the

syllabus.  Therefore, I would affirm the judgments of the court of appeals holding that, pursuant to R.C. 3767.05(A), knowledge of and either acquiescence or participation in the nuisance on the part of an absentee landowner is required to find one guilty of maintaining a nuisance under R.C. 3767.02.

{¶ 82} In *dictum* in *State ex rel. Miller v. Anthony* (1995), 72 Ohio St.3d 132, 139, 647 N.E.2d 1368, 1374, quoting *State ex rel. Freeman v. Pierce* (1991), 61 Ohio App.3d 663, 671, 573 N.E.2d 747, 752, this court unanimously stated:

" '[I]n order to obtain an abatement order pursuant to R.C. 3719.10 and 3767.02 *et seq.*, it is necessary for the relator to prove by clear and convincing evidence that the defendant had knowledge of and either acquiesced to or participated in a felony violation of R.C. Chapter 2925 or 3719 on the property.' "

{¶ 83} Moreover, in interpreting R.C. 3767.05(A), the *Freeman* court explained:

"Clearly, there would be no reason for including evidentiary presumptions in the statute unless it were necessary that the [state] prove these elements. Therefore, the [state] must show that the defendant knew of the drug offenses, and either participated in them, or acquiesced in their occurrence.  * * * Without such a requirement, the statute would seem to authorize any resident of the county to trespass on an innocent landowner's property, commit a drug offense there, and then commence proceedings to have the property declared a nuisance.  Such an absurd result could not have been intended by the legislature." (Emphasis and footnote deleted.)  *Freeman*, 61 Ohio App.3d at 670-671, 573 N.E.2d at 752.

{¶ 84} In the present cases, the court of appeals affirmed the judgment in favor of each appellee on the basis that in order to obtain an order of abatement against these appellees, the state must prove by clear and convincing evidence that each owner had knowledge of and either acquiesced to or participated in (creating or maintaining) the nuisance.  Parenthetically, this writer concludes that without a predicate of such evidence of knowledge, acquiescence, or participation on the part

of parties, such as these appellees, there is no statutory ground upon which to impose the sanctions set forth in various relevant sections in R.C. Chapter 3767. Further, the reversals mandated by the majority amount to somewhat of a redundancy because it appears that the trial courts in these appeals have already determined that appellees were not guilty of maintaining the respective nuisances. Thus, I would affirm the decisions of the court of appeals.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶ 85} The majority holds that R.C. 3767.06(A) violates the U.S. and Ohio Constitutions when applied to property owners who are unaware of an illegal use of their property, and who make reasonable attempts to abate that use once discovered. In its opinion, the majority overrules a prior decision of this court and distinguishes a recent U.S. Supreme Court case reaching a contrary conclusion. I believe the majority's approach disregards binding federal precedent and fails to accord the necessary presumption of constitutionality to the statute. For these reasons, I dissent from Parts III and IV of the majority's opinion.

I.     Presumption of Constitutionality

{¶ 86} It is important to emphasize that appellees carry a heavy burden in arguing that R.C. 3767.06(A) is unconstitutional. It is settled beyond argument that statutes enjoy a strong presumption of constitutionality. *State v. Collier* (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552, 553. To prevail on their claims, appellees must show that the statute is unconstitutional beyond any reasonable doubt. *State ex rel. Richard v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund* (1994), 69 Ohio St.3d 409, 413, 632 N.E.2d 1292, 1296. I believe, as indicated in the discussion that follows, that the appellees have failed to clear this high bar.

II.     Federal Case History

{¶ 87} A long line of federal cases supports the conclusion that property owners who are unaware that their property is being used for illegal purposes, and

who have not in any way participated in that use, may still be required to forfeit their property despite their apparent innocence. This conclusion has typically been reached on either one of two theories. The first theory is that the property itself has committed the offense. The second is that the owner necessarily bears some responsibility for entrusting the property to someone who would use it illegally. See *Austin v. United States* (1993), 509 U.S. 602, 615, 113 S.Ct. 2801, 2808, 125 L.Ed.2d 488, 501. Regardless of the theory used, federal courts have concluded that the law of forfeiture is "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Goldsmith-Grant Co. v. United States* (1921), 254 U.S. 505, 511, 41 S.Ct. 189, 191, 65 L.Ed. 376, 379. See, also, *Bennis v. Michigan* (1996), 516 U.S. 442, 453, 116 S.Ct. 994, 1001, 134 L.Ed.2d 68, 79.

{¶ 88} In *Dobbins's Distillery v. United States* (1877), 96 U.S. 395, 24 L.Ed. 637, the U.S. Supreme Court considered a case where a party leased both real and personal property in order to operate a distillery. In conducting that business, the lessee was found to have kept false books and to have defrauded the federal government of taxes. As a result, the government seized the leased business property and forfeited it. The owner fought the forfeiture on grounds that he had no knowledge of the possessor's illegal activities. The court upheld the forfeiture, stating:

"Cases often arise where the property of the owner is forfeited on account of the fraud, neglect, or misconduct of those intrusted with its possession, care, and custody, even when the owner is otherwise without fault * * * and it has always been held * * * that the acts of [the possessor] bind the interest of the owner * * *, whether he be innocent or guilty, and that * * * [the owner] impliedly submits to whatever the law denounces as a forfeiture attached to the [property] by means of [the possessor's] unlawful or wanton misconduct." *Id.* at 401, 24 L.Ed. at 639.

**{¶ 89}** Forty-four years later, the U.S. Supreme Court considered the case of *Goldsmith-Grant Co.* In that case, an auto dealer retained title to a sold vehicle as security for the purchase price. The purchaser thereafter used the vehicle to transport and conceal goods with intent to evade taxes. The violated statute provided for forfeiture of the car. The innocent dealer argued the forfeiture violated his constitutional right to due process. When faced with this constitutional challenge, the court conceded there was strength in the argument. *Goldsmith-Grant Co. v. United States* (1921), 254 U.S. 505, 510, 41 S.Ct. 189, 190, 65 L.Ed. 376, 378. It noted, however, that there were "other and militating considerations," such as "the necessities of the Government, its revenues and policies" and "the necessity of making provision against their violation or evasion." *Id.* at 510, 41 S.Ct. at 190-191, 65 L.Ed. at 378.

**{¶ 90}** The Supreme Court considered the plight of another innocent owner in *Van Oster v. Kansas* (1926), 272 U.S. 465, 47 S.Ct. 133, 71 L.Ed. 354. In that case, the court again upheld the forfeiture, stating:

"It is not unknown, or indeed uncommon, for the law to visit upon the owner of property the unpleasant consequences of the unauthorized action of one to whom he has entrusted it. * * * [C]ertain uses of property may be regarded as so undesirable that the owner surrenders his control at his peril." *Id.* at 467, 47 S.Ct. at 134, 71 L.Ed. at 358.

**{¶ 91}** In *Calero-Toledo v. Pearson Yacht Leasing Co.* (1974), 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452, the Supreme Court again dealt with facts similar to those in the prior cases and the cases at bar. In *Calero-Toledo*, the court reviewed the cases cited above, noting that "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *Id.* at 683, 94 S.Ct. at 2092, 40 L.Ed.2d at 468. Citing the "legitimate governmental interests" served by the statute, the court concluded that the assertions of unconstitutionality "squarely collide[d]" with "the long line of this Court's decisions" finding such

actions constitutional. *Id.* at 688, 94 S.Ct. at 2094, 40 L.Ed.2d at 471. Once again, the court upheld the forfeiture.

**{¶ 92}** Finally, as recently as 1996, the Supreme Court arrived at the same conclusion in *Bennis v. Michigan* (1996), 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68. In that case, Mrs. Bennis jointly owned a vehicle with her husband who, without her knowledge, used it to solicit prostitution. A Michigan court ordered the vehicle forfeited as a public nuisance, notwithstanding Mrs. Bennis's part ownership of it and her lack of knowledge regarding her husband's activities. The *Bennis* court found that the forfeiture violated neither the Due Process Clause of the Fourteenth Amendment nor the Takings Clause of the Fifth Amendment to the U.S. Constitution. The majority in the cases at bar declines to follow *Bennis*, however, seeking to distinguish it on four points.

**{¶ 93}** The majority first attempts to distinguish *Bennis* by pointing out that Mrs. Bennis conceded her car was subject to forfeiture and merely sought compensation for her loss; thus, no analysis of the propriety of the forfeiture was necessary. But the Supreme Court "granted certiorari in order to determine whether Michigan's abatement scheme ha[d] deprived [Mrs. Bennis] of her interest in the forfeited car without due process * * * or ha[d] taken her interest for public use without compensation." *Bennis*, 516 U.S. at 446, 116 S.Ct. at 998, 134 L.Ed.2d at 74. It then launched a lengthy historical analysis, citing the cases summarized *supra* in support of the theory that an innocent owner may constitutionally have property forfeited due to the illegal acts of its user. It appears, then, that although the court did acknowledge Mrs. Bennis's acquiescence to the forfeiture, that fact made little or no difference in its analysis. There is nothing in the opinion to suggest that, had this factor been otherwise, the court would have ruled contrary to long-existing federal precedent. Therefore, I do not find this a valid reason for distinguishing *Bennis*.

**{¶ 94}** The majority next distinguishes *Bennis* on the fact that the Michigan court had discretion in ordering the forfeiture, whereas Ohio courts do not. Though the U.S. Supreme Court found some significance in this fact, it noted the discretion primarily to emphasize the equitable nature of the action. *Id*. at 452, 116 S.Ct. at 1000, 134 L.Ed.2d at 78. Likewise, these actions are equitable. In R.C. 3767.03, the Ohio legislature specifically identified nuisance abatement proceedings as equitable, and this court agreed with that characterization in *State ex rel. Miller v. Anthony* (1995), 72 Ohio St.3d 132, 136, 647 N.E.2d 1368, 1371-1372. Therefore, because the point the *Bennis* court found significant was the equitable nature of the action, and because these actions are also equitable, the level of discretion allowed the lower court seems an unpersuasive point on which to dismiss the authority of that case.

**{¶ 95}** The third point on which the majority distinguishes *Bennis* is that, in that case, no showing was ever made that Mrs. Bennis took any affirmative action to prevent or abate the illegal use of her vehicle. The majority goes to great lengths to explain the impossibility of owners' exerting foolproof control over leased or loaned property, and the difficulties involved in abating illegal uses once discovered. One must wonder what the majority would suggest Mrs. Bennis have done to anticipate the use to which her husband would put their vehicle. One must also ask if there would not be even greater difficulty in abating the illegal use of property where the wrongdoer actually owns a half interest in that property? Requiring Mrs. Bennis to discover and abate the nuisance in her case seems an even less reasonable expectation than requiring appellees in these cases to do so. Yet the U.S. Supreme Court upheld the forfeiture in *Bennis*, finding that it was not violative of the U.S. Constitution.

**{¶ 96}** In making this third distinction, the majority also cites language from *Calero-Toledo*, which states, "it would be difficult to reject the constitutional claim of * * * an owner who proved not only that he was uninvolved in and unaware of

the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." *Calero-Toledo*, 416 U.S. at 689, 94 S.Ct. at 2094-2095, 40 L.Ed.2d at 471. The majority believes this language supports its conclusion that appellees should not be forced to forfeit their property in these cases. However, Mrs. Bennis cited this very same language and the *Bennis* court rejected it, stating, "this comment was obiter dictum, and '[i]t is to the holdings of our cases, rather than their dicta, that we must attend.' " *Bennis,* 516 U.S. at 450, 116 S.Ct. at 999, 134 L.Ed.2d at 77, quoting *Kokkonen v. Guardian Life Ins. Co. of Am.* (1994), 511 U.S. 375, 379, 114 S.Ct. 1673, 1676, 128 L.Ed.2d 391, 396.

**{¶ 97}** The fourth point on which the majority distinguishes *Bennis* is that the forfeiture of the vehicle in that case served a remedial purpose. Proceeds from the sale of the vehicle helped to pay the state's costs in prosecuting the action. *Bennis*, 516 U.S. at 456, 116 S.Ct. at 1002, 134 L.Ed.2d at 81 (Thomas, J., concurring). The majority in these cases concludes that the force of Mrs. Bennis's constitutional challenges was diminished in light of this remedial effect, and that padlocking appellees' houses for a year cannot possibly serve such a purpose.

**{¶ 98}** But padlocking appellees' houses in these cases serves purposes beyond mere punishment. In fact, this court has found such orders to be preventive rather than punitive. *Miller,* 72 Ohio St.3d 132, 647 N.E.2d 1368, at paragraph two of the syllabus. In *Miller*, we stated that "the provision requiring the imposition of the closing order acts to restore safety in the area where the drug nuisance is located. The purpose of this provision is to ensure the abatement through non-use of the property for one year." *Id.* at 138, 647 N.E.2d at 1373. Also, such orders "may have the desirable effect of inducing [owners] to exercise greater care in transferring possession of their property." *Calero-Toledo,* 416 U.S. at 688, 94 S.Ct. at 2094, 40 L.Ed.2d at 471. If, as the majority suggests, the *Bennis* court found the remedial effect of selling a $600 car to help defray the state's costs sufficient reason

to weaken Mrs. Bennis's constitutional arguments, then the preventive purposes served by the padlocking order in these cases seem an even greater justification for finding the statute constitutional.

{¶ 99} The majority painstakingly attempts to distinguish the precedent set by *Bennis*. I do not believe the distinctions noted are sufficient to overcome that authority, particularly in light of the federal precedent discussed above and the presumption of constitutionality afforded all statutes. I believe *Bennis* is controlling here, and that the majority errs in dismissing its influence.

### III.  Case No. 96-1895

{¶ 100} The majority finds the case of appellee Terrell a special situation and easily disposes of it on grounds different from that of the cases of appellees Rezcallah and Gonzales. I believe, however, that *Bennis* controls all three cases. The majority paints a picture of all three appellees as innocent owners, Terrell being the least culpable of all. The court likens Terrell's situation to one in which property is stolen from an owner, rather than leased or borrowed, and it cites one-hundred-ninety-year-old language stating, "If, by private theft, or open robbery, *without any fault on [the owner's] part*, his property should be invaded, * * * the law cannot be understood to punish him with the forfeiture of that property." (Emphasis added.) *Peisch v. Ware* (1808), 8 U.S. 347 (4 Cranch 347), 364, 2 L.Ed. 643, 648.

{¶ 101} Even assuming the quoted language in *Peisch* represents good law and constitutes a valid exception to all the above cited cases, I do not believe it sufficient to dispose of Terrell's case, as I do not believe Terrell is "without fault." The facts cited by the majority disclose that Terrell's property was not stolen. Terrell invited a guest, Julius Jones, to live with him. Eventually, he asked Jones to leave. Jones did leave, but continually returned without Terrell's consent. Finally, as the majority puts it, Terrell "abandoned the residence, leaving it to Jones."

{¶ 102} Federal courts have not clearly carved out any exception to forfeiture law for owners whose property is taken and used illegally without any fault or knowledge on their part. If, in fact, there is a valid exception, Terrell does not fit the bill. The fact that Terrell sought to have Jones permanently removed from his property may place him on the same level as a landlord who attempts an eviction, but not on the same level as one who had no knowledge his property had been taken. For this reason, I believe Terrell is subject to the same law as Rezcallah and Gonzales and must stand or fall on the same ground. Because I believe this ground was elucidated in *Bennis*, I respectfully disagree with the majority's determination that Terrell's rights under the Due Process Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment have been violated.

IV. Section 19, Article I of the Ohio Constitution

{¶ 103} The majority also concludes that R.C. 3767.06(A) violates Section 19, Article I of the Ohio Constitution. Again, I respectfully disagree.

{¶ 104} Although the language differs, the Takings Clauses of both the U.S. and Ohio Constitutions essentially provide that no private property shall be taken for public use without just compensation. "[W]here the provisions are similar and no persuasive reason for a differing interpretation is presented, this court has determined that protections afforded by Ohio's Constitution are coextensive with those provided by the United States Constitution." *State v. Robinette* (1997), 80 Ohio St.3d 234, 238, 685 N.E.2d 762, 766. Therefore, because the U.S. Supreme Court has found that innocent owners may be forced to forfeit their property for the acts of those to whom they have entrusted it, I see no persuasive reason for interpreting the Ohio provision differently.

{¶ 105} Even in analyzing the Ohio Constitution independently, however, I would arrive at the same conclusion. First, these cases do not present the typical takings situation. The majority uses the terms "forfeiture" and "takings" interchangeably. I believe this is error. While the padlocking order is not a

forfeiture to the extent that it is preventive rather than punitive, see *Miller,* 72 Ohio St.3d at 138, 647 N.E.2d at 1372, there is still some culpable conduct necessary to trigger it. Takings, on the other hand, have traditionally been understood to mean a government action triggered strictly by some public need, where no culpability is involved.

{¶ 106} Here, the government was prompted to take action due to the illegal activities of individuals using the appellees' properties. The necessity arose as a result of someone's culpable conduct rather than some governmentally imposed goal; therefore, the situation in these cases is not a typical taking.

{¶ 107} Additionally, these cases do not present the typical takings scenario because, unlike other takings cases, here the owner has the option of posting bond to avoid the lost use of the property. R.C. 3767.06(A) provides that an owner whose property is subject to a one-year padlock order may post bond in the amount of "the full value of the real property" to prevent the closure from carrying forth. R.C. 3767.04(C). The majority dismisses this option as a taking equivalent to the taking of the property because the value is the same and some owners cannot afford to post such a bond. But the cost of posting a bond is only a percentage of the full value of the property. Therefore, the value actually surrendered by the owner is far less than the full value of the property, making this a much more realistic option than the majority would allow.

{¶ 108} Once again, in light of the presumption of constitutionality afforded all statutes, appellees bear the heavy burden of demonstrating that R.C. 3767.06(A) is unconstitutional beyond all reasonable doubt. Given this fact and the above discussion, I do not believe appellees have proven that the statute violates the Takings Clause of the Ohio Constitution. I therefore disagree with the majority's finding in this regard.

V. *Lindsay v. Cincinnati*

{¶ 109} In arriving at its conclusion that R.C. 3767.06(A) violates the U.S. and Ohio Constitutions, the majority also wishes to overrule the prior decision of this court in *Lindsay v. Cincinnati* (1961), 172 Ohio St. 137, 15 O.O.2d 278, 174 N.E.2d 96. The facts in that case are very similar to those in the current cases and the federal cases summarized above. In *Lindsay*, the owner of an automobile loaned the car to someone who, without the owner's knowledge or participation, used it for illegal purposes. Consistent with the cases discussed *supra*, *Lindsay* concluded there was no constitutional violation.

{¶ 110} In overruling the *Lindsay* decision, the majority points out that the court in that case misconstrued the holding in *Grosfield v. United States* (1928), 276 U.S. 494, 48 S.Ct. 329, 72 L.Ed. 670. *Lindsay* relied on *Grosfield* to support the conclusion that it was constitutional to subject an innocent owner's property to forfeiture. *Lindsay*, 172 Ohio St. at 141, 15 O.O.2d at 280, 174 N.E.2d at 99. I agree that *Grosfield* does not stand for this proposition, as the owner in that case was found to bear some culpability. *Grosfield*, 276 U.S. at 498, 48 S.Ct. at 331, 72 L.Ed. at 672. To this extent, the cite in *Lindsay* to *Grosfield* is error. But *Grosfield* was not the only authority *Lindsay* cited. In arriving at its conclusion, the *Lindsay* court also relied on *Goldsmith-Grant* and *Dobbins's Distillery*, both discussed above, along with other U.S. Supreme Court decisions. *Lindsay,* 172 Ohio St. at 139-140, 15 O.O.2d at 280, 174 N.E.2d at 99. Such reliance was proper in that case, just as it is in these cases, and the ultimate conclusion in *Lindsay* was correct under the precedent available both then and now.

{¶ 111} It is interesting to note that in *Lindsay*, this court repeatedly emphasized the role of the legislature in determining issues of forfeiture. That case recognized the legislature's "large discretion" in determining "not only what the interests of the public require, but what measures are necessary for the protection of such interests." *Id.* at 139, 15 O.O.2d at 279, 174 N.E.2d at 98. The court noted that forfeiture, as applied to an innocent owner, is a "question of public policy

which must be decided by the appropriate legislative authority and is not within the province of this court to decide." *Id.* at 140, 15 O.O.2d at 280, 174 N.E.2d at 99. I conclude that the same is still true. I believe *Lindsay* represents good law, with the exception of one sentence which misconstrues *Grosfield*, and that it should be followed in these cases.

## VI. Conclusion

{¶ 112} The legislature has set forth a statutory framework that serves a legitimate, preventive purpose. That framework cannot be avoided without a showing that it is unconstitutional beyond any reasonable doubt. Appellees have failed to make that showing here. For this reason, I respectfully dissent from the majority's conclusion that the statute is violative of the Fifth Amendment Takings Clause and the Fourteenth Amendment Due Process Clause of the U.S. Constitution, and Section 19, Article I of the Ohio Constitution.

_____