Larry MICK, et al., Plaintiffs,

v.

LEVEL PROPANE GASES,
INC., Defendant.

No. 2:98–CV–959.

United States District Court,
S.D. Ohio,
Eastern Division.

April 6, 2001.

Joseph F. Murray, Geoffrey J. Moul, Murray Murphy Moul & Basil, Columbus, OH, Kimberly M. Skaggs, Columbus, OH, Gary Michael Smith, Graham McClelland Ransbottom, Dover, OH, for plaintiffs.

Thomas Brennan Ridgley, Vorys Sater Seymour & Pease, Columbus, OH, John Ryan Gall, Squire Sanders & Dempsey, Columbus, OH, Amanda Martinsek, Vorys Sater Seymour & Pease, Cleveland, OH, for defendant.

## OPINION AND ORDER

SARGUS, District Judge.

This matter came before the Court on March 14 and 15, 2001 for a Hearing on Plaintiffs' February 14, 2001 Motion for Class–Wide Temporary and Preliminary Injunctive Relief. (Doc. # 47). The Plaintiffs' motion is granted in part and denied in part, as set forth below.

### I.

Plaintiffs herein are comprised of a class of residential consumers of propane gas supplied by Defendant Level Propane Gases, Inc. ["Level"]. The Plaintiff class consists of all Ohio residential consumers who, at any time on or after September 1, 1994, are, have been, or will be customers of Level.[1] Plaintiffs' claims are brought pursuant to the Equal Credit Opportunity Act ["ECOA"], 15 U.S.C. § 1691, *et seq.;* the Fair Credit Reporting Act ["FCRA"], 15 U.S.C. § 1681, *et seq.;* and the Ohio Consumer Sales Practices Act ["CSPA"], O.R.C. § 1345.01, *et seq.* Plaintiffs' Motion for Class–Wide Temporary and Preliminary Injunctive Relief centers on Level's alleged failure to adhere to its "firm" or "guaranteed" pricing as stated in the relevant consumer contracts and in mass-marketing materials. The Plaintiffs seek injunctive relief pursuant to R.C. § 1345.09(D) and Fed.R.Civ.P. 65. The Court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1367.

In this case, Plaintiffs allege that Level has violated the CSPA by failing to make

---

1. The class also consists of two subclasses: (1) all Ohio residential consumers of propane as to whom, at any time on or after October 1, 1997, Level took or participated in adverse action based in whole or in part upon information in a consumer credit report or from a third party, as those terms are defined in 15 U.S.C. § 1681, *et seq.;* and (2) all Ohio residential consumers of propane who, at any time on or after September 1, 1996, did or will sign a credit application similar to that attached to the complaint, or those consumers who are or will be applicants for credit and/or the subject of adverse action by the defendant.

timely deliveries of propane gas to consumers; by failing to provide adequate customer service to consumers; and by engaging in deceptive and/or unconscionable pricing practices with respect to consumer propane gas contracts.

## II.

Level, headquartered in Westlake, Ohio, is a large distributor of propane, a gas used by consumers for heat, as well as cooking. Propane is a fuel which is typically stored by consumers in on-site tanks, particularly useful to residents who do not live in the vicinity of natural gas lines. Level does business in fourteen states. Approximately 40,000 of Level's 100,000 total customers are located in Ohio.

The consumer propane heating season spans the months of November to March each year. Prior to the heating season, and particularly in July and August, propane prices are generally at their lowest point in the market. Level historically entered into contracts with suppliers during the months of April through September for what is known as the "forward purchase" of propane. In the several years prior to 2000, seventy-five per cent of Level's projected propane supply for the heating season was secured through forward contracts. According to its current CEO, Walter Himmelman, most of Level's competitors did not purchase propane through forward contracts. Level entered into such contracts as a means to control propane costs and offer its consumers competitive prices. Level competes with a number of other propane suppliers. Companies in the propane market seek to offer prices lower than competitors and often offer promotional introductory offers with price incentives to obtain new customers.

In April and May 2000, the market price for propane was not as low as it had been in previous years. In addition, prices fluctuated more than Level had anticipated. Himmelman testified that, although Level had secured some forward contracts in May and June 2000, Level did not acquire the amount of its anticipated winter season propane supply that it historically had purchased during this period. Level expected the prices to drop further in June 2000. As Himmelman testified, Level made a business decision not to contract for additional propane supplies in June or July 2000.

By late August and early September 2000, however, Level was unable to secure forward contracts from suppliers. Thus, by September 2000, Level knew that it would have to purchase the majority of its supply for the upcoming heating season at market prices. In November 2000, the weather was very cold and Level's delivery of propane to consumers had to be accelerated. In addition, Level's customer base for residential propane heat had grown.

Further, as to Level's forward purchases, two of Level's suppliers had invoked *force majeure* clauses contained in the supply contracts which forced Level to buy even more propane on the open market. Through a confluence of these events, Level was required to purchase the majority of its propane supply on the open market beginning in the 1999–2000 heating season. During this period, the price of propane rose substantially.

Before the pricing events described above had occurred, in April 2000, approximately 12,000 customers who had been with Level for one year received one of two letters purporting to offer guaranteed prices on continued propane service. (*Defendant's Exhibit 3*). The April 5, 2000 letter, which stated the customer's name and current propane price at the upper corner, read as follows:

> To thank you for your loyalty to Level Propane, we would like to extend a guarantee on your propane price until

the spring of 2001. This could equal great savings to you. However, this is just the beginning!

Would you like to continue receiving your current Level Propane price even after next spring? We are now offering you the opportunity to lock in your current propane price. For just one low payment of $59.95 for a 500 gallon tank, your Level Propane costs will remain at your current price per gallon for another full year. This means your propane costs are guaranteed until the spring of 2002.

We would also like to tell you about a Level program designed to save you, our valued customer even more money. Our Pre–Buy Program allows you to purchase your propane at a discounted rate of 10 cents per gallon. By pre-buying a minimum of twice your tank size, Level will pass this incredible savings opportunity on to you if you purchase by May 1, 2000. We will also extend a discount of 8 cents per gallon through September 1, 2000. We must receive your payment 7 days before your first Pre–Buy delivery.

(*Defendant's Exhibit 3* ). In a similar letter dated April 10, 2000, Level informed other customers that Level "would like to extend a guarantee on your propane price until the spring of 2001." (*Id.*). This letter also contains at the top left corner, the customer's account number and the "current price" of propane gas. A number of Level consumers received letters purporting to guarantee their then current rates for propane until Spring 2001. These letters were sent to induce customers to remain Level customers and to prevent customers from switching to other suppliers.

By September 2000, however, when it became apparent to Level that it would be more expensive to acquire propane, Level informed its customers that it would not be able to abide by the previously guaranteed prices. By that time, customers could not take advantage of the cheaper prices otherwise available in April and May. Plaintiffs' present claim for injunctive relief arises as a consequence of these events.

The price Level consumers pay for propane gas is established by contract. The founder and former CEO of Level, William Maloof, who ran Level until February 2001, testified that first-time Level customers had contracts with "firm until" prices. These contracts specified a certain price that was "good until," for instance, Spring 2000 or Fall 2000.[2] Nonetheless, Maloof testified that Level retained the right to fluctuate prices pursuant to the following language, which the Court notes is contained in some, but not all, of the consumer contracts at issue:

> Propane Service—Best Efforts—This contract is limited to supplying propane gas to customer. Propane gas service is provided by Level on a best efforts basis at prices established from time to time.

(*Exhibit 1* attached to *Deposition of William Maloof*).

Other consumers had "lock in" prices. Under such an agreement, a customer would pay an up front fee for gas services for a particular season, *e.g.,* Spring or Fall. A third set of customers were on a "prebuy" program. Under this program, a customer would prepay for fuel at a specified rate and Level would deliver the gas as needed. If the customer did not use all of the gas purchased under the agreement, Level would refund the money or would allow the customer to use gas at the market rate. Maloof testified that Level always offered participation in "pre-buy" programs; "lock-ins" were only available during the Spring and Summer. Maloof

---

**2.** Maloof testified that the present contracts have eliminated such seasonal references and now contain a date certain, *i.e.,* March of the particular year.

testified that the "current price" listed on the letters was most likely different from the prices identified as "firm until" in the customers' contracts.

In September 2000, Level sent letters to customers who received the April 2000 letters and had not elected to enter into pre-buy or lock-in rates. The September letter stated that "[e]xtraordinary increases in energy costs have forced Level to discontinue its offers to guarantee propane prices through the spring of 2001." (*Defendant's Exhibit 4*). Thus, unless the customer had either locked in a price or had elected to participate in the pre-buy program, the customer would be subjected to increased prices due to Level's increased supply costs. (*Id.*). Maloof testified that, in his view, this letter allowed Level customers to seek propane from other sellers if they so desired. As the testimony revealed, however, by September 2000, prices charged by other dealers which could have been locked in during the months of April or May were no longer available.

Maloof further testified that a Level customer is always able to break a contract, for a fee, upon thirty days notice. Maloof testified that no fee would have been imposed upon customers who terminated as a result of the September 2000 letter. Maloof acknowledged, however, a customer would not have known this by simply reading the September 2000 letter.

Maloof also testified that during March 2000, Level ceased identifying the price paid per gallon on customer bills presented at the time of delivery. Maloof attributed this altered practice to a change in computer programming. It is undisputed, however, that after March 2000, a customer did not receive a bill that indicated the price per gallon for propane.

The Plaintiffs presented the testimony of several customers of Level. Mr. Emmett Klein was one of the customers who received the April 5, 2000 letter. (*Defendant's Exhibit 20* at 653A). Although the letter guaranteed Klein's then current rate of 94.9 cents per gallon until Spring 2001, he was charged 1.469 per gallon for 258.8 gallons in November 2000 and 2.09 for 932 gallons in January 2001. (*Defendant's Exhibit 20*). Klein's tank was capable of holding 1000 gallons of propane. Klein had received the letter in September 2000 stating that "[e]xtraordinary increases in energy costs have forced Level to discontinue its efforts to guarantee propane prices through the spring of 2001." (*Id.* at 653). Mr. Klein further testified that despite his calls to Level in January of 2001 advising that his tank was running low, he ran out of gas on January 3, 2001 and remained without heat for four hours as a consequence.

Mr. Jim Northeim also was charged an amount in excess of the price guaranteed in April of 2000. Northeim received the April 5, 2000 letter purporting to guarantee that a rate of 89.9 cents would remain firm until Spring 2001. (*Plaintiffs' Exhibit 47*). Northeim also received the Spring 2000 Level newsletter stating that propane prices would remain stable. (*Defendant's Exhibit 35*). When Northeim called to request propane delivery, he was quoted a price over the phone of 1.49 per gallon. Northeim disputed this and when delivery was made, he was billed at a rate of 1.749 per gallon. Northeim again disputed this bill. He was eventually credited at a rate of 1.49 per gallon. Northeim contends that the price should have been 89.9 per gallon as represented in April 2000.

Mr. David Clark also received the April 5, 2000 letter. Clark first contacted Level in 1999 and was told over the telephone that he would receive propane at a price of .459 cents per gallon for six months. Mr. Clark was also told that the price would not increase more than ten cents per gal-

lon per year for the duration of his lease on the propane tank. Clark testified that, at the time, the price quoted was twenty to thirty cents cheaper than the rates offered by other suppliers. Upon installation of the tank, Clark received a written contract which listed a price of .459 per gallon "firm until Spring 2000." (*Clark Deposition Exhibit 1*). According to Clark, Level did not adhere to its pricing guarantees as he was charged more per gallon after his first six months of service. In April 2000, Clark received the letter guaranteeing a price per gallon of 1.049 firm until spring 2001. (*Clark Deposition Exhibit 5*). In January 2001, Clark was charged 1.799 per gallon.

Mr. Allen Nutt received the April 10, 2000 letter guaranteeing a price of 1.119 per gallon firm until Spring 2001. (*Nutt Deposition Exhibit 5*). In November 2000, Nutt was billed for propane at a rate of 1.459 per gallon. Nutt called to dispute the price and informed Level that he was paying the same under protest. In December 2000, Nutt was charged 1.959 per gallon. Nutt paid only what he thought was due; *i.e.*, 1.119 per gallon. In January 2001, Nutt received an invoice from Level indicating a balance due with late fees. Sometime thereafter, Nutt called Level to request a propane delivery but was told that no further deliveries would be made due to an outstanding balance. Nutt informed Level that he did not believe he owed the amount claimed. At the time of his testimony, Nutt's propane tank was completely empty. Nutt testified that he is retired and lives on a fixed income consisting of disability retirement benefits.

Other witnesses provided testimony regarding their experiences with Level's pricing practices. Mr. Michael Girman, who uses propane for heat and cooking, has been a Level customer since November 1992. Girman received a letter on February 19, 1999 stating that Level would "guarantee" that the price per gallon of propane would not exceed Girman's then current price of 99.9 cents per gallon, for the next thirty months. (*Plaintiff's Exhibit 32*). Girman testified that, despite the guarantee, he was charged 1.279 per gallon for 417 gallons in December 2000 (*Plaintiffs' Exhibit 35*) and he was charged 1.69 per gallon for 394.6 gallons in January 2001. (*Plaintiffs' Exhibit 36*).

Mr. Roy Dutcher, who uses propane for heating and cooking, entered into an oral agreement with Level in October 1999 for propane service at a price of 47.9 cents per gallon, guaranteed until Spring 2000. Level further guaranteed that the price of propane would not increase by more than ten cents per gallon each year thereafter. Dutcher never signed a written agreement with Level. Dutcher testified that in February 2001, he was charged 1.999 per gallon. Dutcher paid only the amount he believed he owed. He testified that he has not been refunded for amounts for which he believes he overpaid in the past.

Dr. Carl Lechner contracted with Level in December 1997 for propane service at a rate of 99.9 cents per gallon for one year. On October 23, 2000, Lechner changed to a smaller tank and was told by Level that the price per gallon would be 1.3999. Lechner did not receive a contract but presumed the quoted price would be good for one year. In December 2000, Lechner began to run low on propane. He called Level four to six times per day but received answering machine messages. On Christmas night 2000, Lechner reported 0% propane in the tank; Level filled the tank the next day. Lechner was charged 2.40 per gallon. In January 2001, Lechner wrote to Level to request a credit for the 175 gallons of propane which were in the tank that was previously removed. (*Plaintiffs' Exhibit 29*). Lechner testified that he received no response. Lechner

**810**

wrote a second letter on February 2, 2001 expressing his dissatisfaction with Level's service. (*Plaintiffs' Exhibit 26* ). Lechner received no response. Lechner acknowledged that on March 7, 2001 his bill was credited for the 175 unused gallons of propane.

Mr. and Mrs. Recker testified that, although they had pre-purchased propane service, they too were overcharged. The Reckers signed a contract on June 3, 1999 for 2000 gallons of gas at .499 per gallon. (*Plaintiffs' Exhibit 18* ). Mrs. Recker testified that, although they prepaid that amount, they have only received 1,752 gallons of propane. In addition, they have been charged for additional gallons of propane and not credited for the balance of the unused 2000 gallons. Level contends that the Reckers had to use the 2,000 gallons within the first year of service. The contract, however, makes no mention of such a requirement. Furthermore, Mrs. Recker testified that she was never informed of such a requirement when she inquired with Level regarding the invoices.

Similarly, Ms. Laurie Cirone, who has been a Level customer since 1996, testified that pursuant to a March 1, 1999 letter from Level, she pre-purchased 1000 gallons of propane at .649 per gallon in August 1999. (*Plaintiffs' Exhibit 38; Exhibit 39* ). She was, however, not informed that the 1000 gallons had to be used within one year. Consequently, Cirone was billed for propane delivery in January 2001 even though she had not received all of the prepaid quantity of propane.

## III.

### A. Injunctive Relief Under the Ohio Consumer Sales Practices Act

Plaintiffs contend that the evidence adduced shows that the Defendant engaged in deceptive and unconscionable sales practices in violation of R.C. § 1345.02 and § 1345.03. As a remedy for the alleged violations, Plaintiffs seek injunctive relief under § 1345.09(D). The Defendant asserts that Plaintiffs can only receive injunctive relief, if at all, upon a showing under Fed. R.Civ. P. 65. Plaintiffs argue that this Court need not analyze their claim for injunctive relief under Rule 65 because this analysis does not apply to an injunction sought pursuant to R.C. § 1345.09(D).

Section 1345.09(D) provides that "[a]ny consumer may seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter." R.C. § 1345.09(D). The Plaintiffs rely upon the Ohio Supreme Court's decision in *Ackerman v. Tri–City Geriatric & Health Care, Inc.,* 55 Ohio St.2d 51, 378 N.E.2d 145 (1978) in support of their ability to receive statutory injunctive relief. In that case, the Ohio Director of Health sought to enjoin the operation of an unlicensed nursing home. The Court held that the traditional balancing of equities was inapplicable to injunctive relief under the statute. The Court stated:

> It is established law in Ohio that, when a statute grants a specific injunctive remedy to an individual or to the state, the party requesting the injunction "need not aver and show, as under ordinary rules in equity, that great or irreparable injury is about to be done for which he has no adequate remedy at law."

*Id.* at 56, 378 N.E.2d 145, quoting *Stephan v. Daniels,* 27 Ohio St. 527, 536, 1875 WL 203 (1875). Plaintiffs also rely upon *State ex rel Pizza v. Rezcallah,* 84 Ohio St.3d 116, 702 N.E.2d 81 (1998), in support of their position. In that case, the Court recognized that it would be inappropriate to require a balance of equities in a statutory injunction case brought by the state because "injunctions which authorize a governmental agent to sue to enjoin activities deemed harmful by the General As-

sembly are not designed primarily to do justice to the parties but to prevent harm to the general public." *Id.* at 123, 702 N.E.2d 81.

The Defendant takes issue with Plaintiffs' reliance upon the foregoing authorities because those cases involved actions by the state rather than by individuals. The Defendant cites two cases from other states applying the rationale of *Ackerman* to their laws and concluding that statutory injunctive relief is available when it is the state which is seeking the injunction. *See State v. Sirois,* 478 A.2d 1117, 1121 (Me. 1984); *Town of Sherburne v. Carpenter,* 155 Vt. 126, 582 A.2d 145, 148 (1990). Thus, Defendant maintains that Plaintiffs in the case at bar must make a showing under Rule 65 in order to obtain the injunctive relief requested.

■ While § 1345.09(D) gives Plaintiffs the right to seek injunctive relief, this Court concludes that in order to be entitled to an injunction the Plaintiffs must make a showing under Rule 65. In *Ackerman,* the Ohio Supreme Court observed that "statutory actions granting governmental agents the right to sue for injunctive relief have a history and purpose different from equitable actions for injunctive relief . . ." *Ackerman,* 55 Ohio St.2d at 57, 378 N.E.2d 145. The Court went on to state that "[u]nlike equitable-injunction actions which were developed in response to a . . . common-law system for redressing non-violent wrongs suffered by one individual at the hands of another . . . [statutory injunctions were] designed by the General Assembly to benefit society by proscribing behavior . . . which the General Assembly has determined not to be in the public interest." *Id.*

Ohio courts have held that the normal balance of equities analysis for injunctive relief does not apply when the statute sets forth a clear standard for violation and where the wrong sought to be redressed is more public than private in nature. For example, statutory injunctive relief is available under R.C. § 713.13 for alleged zoning violations. *See City of Marion v. Turner,* No. 9–98–49, 1999 WL 181395 (Marion Co. March 12, 1999); *Camp Washington Community Board, Inc. v. Rece,* 104 Ohio App.3d 750, 663 N.E.2d 373 (Hamilton Co.1995). In contrast, although R.C. § 309.12 and § 309.13 allow a taxpayer to file suit to enjoin county officials from the illegal expenditure of public funds, such actions are governed by general equitable principles. *See State ex rel. Jones v. Hamilton Co. Board of Commissioners,* 124 Ohio App.3d 184, 705 N.E.2d 1247 (Hamilton Co.1997).

This Court concludes that, unlike the statutes at issue in *Ackerman* or *Turner, supra,* R.C. § 1345.09(D) requires that the Court consider the balance of equities in determining whether injunctive relief is appropriate. While the statute provides that consumers may seek injunctive relief, the statute provides no prerequisites for issuance of the relief. Furthermore, the Court concludes that an injunction under the statute seeks to do justice primarily to the parties rather than the general public. Thus, this Court concludes that injunctive relief under § 1345.09(D) is governed by the same equitable principles that apply to injunctions generally.

## B. R.C. § 1345.02 and § 1345.03

Before considering whether the Plaintiffs satisfy the standard of Rule 65, the Court will first set forth the relevant provision of the CSPA which govern their claims.

Plaintiffs contend that the evidence adduced shows a substantial likelihood of success that the Defendant has engaged in practices that are deceptive and/or unconscionable under the Ohio CSPA. R.C. § 1345.02(A) provides that "No supplier

shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. § 1345.03(A) provides that "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction." It is undisputed in this case that Level is a "supplier" for purposes of the statute. It is also undisputed that Level customers are "consumers" and that the sale of propane constitutes a "consumer transaction."

An act or practice is "deceptive" if it meets one of the definitions set forth in § 1345.02(B). Plaintiffs contend that Level's acts or practices satisfy the definitions contained in subsections (B)(5), (8) and (10). These sections provide:

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:
. . .

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;

* * *

(8) That a specific price advantage exists, if it does not;

* * *

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

Plaintiffs contend that Level has violated each of the foregoing provisions.

In addition, Plaintiffs contend that Level's practices are unconscionable for purposes of R.C. § 1345.03(B)(3), (5) and (6).

Unconscionable practices include the following:

(3) [T]he supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

* * *

(5) [T]he supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) [T]he supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment.

R.C. § 1345.03(B).

## C. Injunctive Relief under Fed.R.Civ.P. 65

The United States Court of Appeals for the Sixth Circuit has identified four factors to assist the Court in determining whether injunctive relief pursuant to Fed.R.Civ.P. 65 is appropriate. The analysis, which involves a weighing of the interests on both sides, requires consideration of the following: (1) whether there is a strong or substantial likelihood of the movant's success on the merits; (2) whether an injunction will save the movant from irreparable injury; (3) whether an injunction will harm others, including the nonmovant; and (4) whether the public interest would be served by issuance of a preliminary injunction. *See e.g., International Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Sandison v. Michigan High School Athletic Assoc.*, 64 F.3d 1026, 1030 (6th Cir.1997). These factors are meant to be balanced as they guide the Court in exercising its discre-

tion; they are not due rigid application and need not be assigned equal weight. *In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir.1992). While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision. The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix. *Id.*

### 1. Likelihood of Success on the Merits

■ The Court first finds that the Plaintiffs herein have demonstrated substantial likelihood of success on the merits of their claims. The evidence presented indicates the likelihood that the Defendant's practices are either deceptive or unconscionable under § 1345.02 and § 1345.03.

The evidence presented reveals that Level consumers were overcharged for propane and/or had difficulty receiving propane service due to good faith billing disputes. Moreover, the evidence presented reveals that a number of Level consumers relied upon Level's April 2000 guarantees on prices, to their detriment. The letters had the effect of "inducing a state of mind in the consumer that [was] not in accord with the facts." *Crull v. Maple Park Body Shop,* 36 Ohio App.3d 153, 158, 521 N.E.2d 1099 (Butler Co.1987).

The testimony is undisputed that Level sent letters to a substantial portion of its customers guaranteeing the then current propane prices. This promise was a clear inducement for customers not to shop for another, cheaper supplier during the summer months, when propane prices were low. When Level tried to rescind the price guaranteed in September, consumers could not obtain cheaper prices from other suppliers, as they could have in April 2000.

Most importantly, at no time prior to the September 2000 notification by Level that it would not be able to honor its prices did Level inform its customers that, although it had guaranteed prices to consumers, that such low prices were contingent upon Level's securing of supply contracts at what it deemed the lowest available price. By offering fixed prices, without disclosing the risk that Level was relying upon, a later attempt at rescission was both deceptive and unconscionable.

■ In addition, this Court also finds that Plaintiffs have shown a substantial likelihood of success on claims that Level engaged in other practices, besides guaranteed pricing in April 2000, which amount to deceptive and/or unconscionable practices. For example, although Mr. and Mrs. Recker pre-purchased 2000 gallons of propane in June 1999 at a rate of .499 per gallon, they were not informed, nor does their contract reflect, that the propane had to be used within one year. Similarly, Ms. Cirone, who pre-purchased 1000 gallons of propane at a rate of .649 cents per gallon in August 1999, was not informed that if she did not consume the amount within one year she would still be charged for propane despite the pre-pay.

■ Level asserts the defense of commercial impossibility. This defense requires a showing that "an unforeseeable event occurred, that the occurrence of the event was a basic assumption underlying the agreement, and that the event rendered performance impracticable." *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 149 (6th Cir.1983). In this case, there has been no testimony or evidence that an unforeseeable event occurred which caused Level to renege on its price guarantees. Rather, as Mr. Himmelman testified, Level made a business decision not to lock in prices in May or June 2000 for the upcoming heating season. Fur-

ther, as Mr. Maloof testified, there was no propane shortage in the last year. Thus, the evidence demonstrates that although Level believed the prices would come down, they did not. Moreover, at no time did Level inform its customers that the "guaranteed" prices were contingent upon their securing low prices from propane suppliers. In short, Level put its consumers at risk and induced their reliance on prices that were not at all a guarantee.

■ Finally, Level has made no financial showing that the allegedly unforeseeable events rendered Level's maintenance of guaranteed prices impossible. Level bears the burden of proving the defense of commercial impossibility. No evidence was adduced by Level to demonstrate that it could not continue to maintain the prices guaranteed in April of 2000. The Court will not speculate as to the financial ramifications of maintaining the earlier price structure.

## 2. Irreparable Injury

The Court must next consider whether injunctive relief will save the movants from irreparable injury. The Defendant contends that equitable relief is inappropriate because the Plaintiffs have adequate remedies at law. Defendant specifically argues that "all claims raised boil down to a matter of money." (*Defendant's Post Hearing Memorandum* at 8). The Defendant also points out that consumers are approaching the end of the heating season. To a certain extent, the Defendant's argument is well-taken.

■ This Court concludes that only a select group of Level consumers will suffer irreparable injury in the absence of injunctive relief. Specifically, these are individuals who have *bona fide* pricing disputes with Level as a consequence of a price having been guaranteed to them for a specified term and, who are unable to obtain propane from Level because Level considers them to be delinquent. This group faces the risk of running out of heating fuel because of the arguable overcharge made by Level in disregarding its promises made in April 2000. Plaintiffs have established that two hundred seventy seven of Level's customers receive subsidies from the State of Ohio through the HEAP program, eligibility for which is based upon income below the federally established poverty level. (*Plaintiffs' Exhibit 9*).

Individuals who are not included in this group are not at risk of irreparable injury and their remedies must await a trial on the merits. Thus, injunctive relief is not warranted for individuals who claim that they are owed credits on their accounts, who have pricing disputes but have the ability to pay, or who claim that they received poor or delayed service or experienced difficulty with customer service representatives. At this juncture, injunctive relief is only appropriate to ensure that those with good faith billing disputes, who do not have the means to pay the amounts allegedly due, do not go without propane service for the remainder of the season.

## 3. Remaining Factors

The Court concludes that any harm to the non-movant that follows from the injunctive relief set forth above does not outweigh the harm that would fall upon the group of individuals entitled to such relief. Furthermore, the Court concludes that the public interest would be served by the issuance of injunctive relief. The evidence clearly demonstrates that Level consumers relied upon representations made with respect to price guarantees. Thus, requiring Level to honor its contracts, at least with respect to the group of individuals identified above, serves the public interest until this case can be finally resolved on the merits.

## IV.

In light of the foregoing, the Plaintiffs' Motion for Class–Wide Temporary and Preliminary Injunctive Relief (Doc. # 47) is **GRANTED** to the following extent:

It is hereby **ORDERED** that the Defendant shall supply propane until **June 1, 2001** to Level consumers who meet both of the following criteria:

1. Are the subject of a good faith billing dispute that is the result of a price guaranteed pursuant to a contract for propane service or pursuant to a letter issued in February 1999 or April 2000; and

2. Are financially unable to pay the amount allegedly due as a result of Level's failure to honor its previous price guarantees.

Recipients of such propane shall pay for such newly delivered propane, either before or at the time of delivery, the amount represented as a fixed price by Level in letters issued in February 1999 or April 2000 with regard to each gallon of propane. The amount of such newly delivered propane shall be sufficient to supply the needs of the various customers through at least June 1, 2001. Whether additional amounts are owed to Level shall be determined at the final trial of this matter.

In all other respects, the Motion for Class–Wide Temporary and Preliminary Injunctive Relief is **DENIED**.

**IT IS SO ORDERED.**