[Cite as *State ex rel. DeWine v. Shadyside Party Ctr.*, 2014-Ohio-2357.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE ex rel. MICHAEL DeWINE, ATTORNEY GENERAL OF OHIO, | ) ) ) | |
| | ) | CASE NO.    13 BE 26 |
| PLAINTIFF-APPELLEE, | ) ) | |
| VS. | ) ) | O P I N I O N |
| SHADYSIDE PARTY CENTER, et al., | ) ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS:          Civil Appeal from Common Pleas Court,
                                   Case No. 13CV112.


JUDGMENT:                          Affirmed.


APPEARANCES:
For Plaintiff-Appellee:            Attorney Michael DeWine
                                   Ohio Attorney General
                                   Attorney Charissa Payer
                                   Principal Assistant Attorney General
                                   30 East Broad Street, 26th Floor
                                   Columbus, Ohio  43215


For Defendants-Appellants:         Attorney Dennis McNamara
                                   88 East Broad Street, Suite 1350
                                   Columbus, Ohio  43215


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite


                                   Dated:  June 2, 2014

VUKOVICH, J.

{¶1} Defendant-appellant Shadyside Party Center et al. appeals the decision of the Belmont County Common Pleas Court ordering closure of the store for one year under the public nuisance statute. Appellant does not contest that the store constituted a nuisance due to the store's habitual selling of herbal incense packets which contained a controlled substance. Instead, appellant argues that the court erred in ordering the closure of the store for one year as a remedy, asserting that they were diligent in correcting the nuisance and the nuisance ceased to exist after the search warrant was executed, the government had unclean hands, and the order should have been narrowly tailored as to the extent of abatement and the forfeiture of personal property.

{¶2} As this is a statutory injunction action, the general equitable principles are inapplicable. Rather, the statutory provisions apply as written. The Supreme Court has created an exception to the mandatory one-year closure provision for an "owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance." Whether appellant fell under this exception depends on the totality of the facts and circumstances and rational inferences that can be drawn therefrom. We shall not substitute our judgment for that of the trial court on these matters. The trial court's judgment is hereby affirmed.

<u>STATEMENT OF THE CASE</u>

{¶3} On March 20, 2013, the State of Ohio ex rel. Michael DeWine, Attorney General of Ohio, filed a civil nuisance complaint against Shadyside Party Center and its owner Stacey Heathcote due to the selling of incense containing a schedule I controlled substance called XLR11. The case was tried to Judge Solovan of the Belmont County Common Pleas Court on May 28, 2013. The parties stipulated to the presentation of the plaintiff's case through the affidavit of an undercover BCI agent and the affidavits of BCI scientists with attached lab reports containing positive test results. The parties also stipulated to the defense exhibits.

{¶4} The defense presented the testimony of an officer who works for the Shadyside Police Department and the Belmont County Drug Task Force. He testified

that in the Fall of 2012, he received a report from the Monroe County Sheriff's Department regarding herbal incense products being sold at Shadyside Party Center and he contacted Stacey Heathcote to investigate the complaint, alerting her to the report. (Tr. 24, 29, 39, 85). The officer stated that he requested samples, and Ms. Heathcote came to the police station volunteering packets to be tested. He gave the samples to the assistant chief of police for testing but was unaware of any results. (Tr. 25). He explained that he never told Ms. Heathcote the incense was legal. In fact, he warned her that she could be arrested for drug trafficking if the products tested positive and mentioned the possibility of a pending investigation by another agency. (Tr. 27-28).

{¶5} On March 4, 2013, an undercover BCI agent went into the store and purchased a three-gram packet of "Purple Haze" and a 2.5-gram packet of "Kush Max" from Stacy Heathcote. The products were on display in a glass case. She charged $45, did not use a cash register, and seemed not to charge sales tax. The "Kush Max" packet stated that it contained no nicotine or tobacco, warned that it should be kept out of reach of children and that it was not intended for human consumption, and stated that it was in accordance with a new federal law effective July 9, 2012. The "Purple Haze" packet stated it was a new and improved formula that was chemical and synthetic free and warned that the "potpourri" should not be inhaled or consumed.

{¶6} The officer sent the substances to BCI for testing. In the meantime, the Belmont County Prosecutor had a letter hand-delivered to Shadyside Party Center on March 7, 2013. In the letter, the prosecutor stated that the Belmont County Drug Task Force had informed him that "you may be selling synthetic marijuana, incense, and/or bath salts that are being smoked or ingested by your patrons. Despite what the labels on these packages provide, that they do not contain illegal substances, most if not all of these products do contain illegal substances." The prosecutor noted that the recipient was a respectable business in the community and expressed a desire to assist the recipient in avoiding future problems by "urging you to cease selling these items immediately and remove all of them from your store."

**{¶7}** The prosecutor warned: "Failure to remove these items and immediately cease selling them could lead to criminal prosecution." And, it was explained that the crime would be at least fifth-degree felony drug trafficking under R.C. 2925.03. The prosecutor reiterated that the letter was sent "[s]o you will know that the bath salts, incense and/or synthetic marijuana that you have in your store should not be sold. That they should immediately be removed from your shelves with no further sales occurring." The letter also noted a recent increase in crimes in the county committed by those under the influence of these items and stated that the prosecutor's office and the drug task force were counting on their help to combat the problem.

**{¶8}** Ms. Heathcote testified that she immediately removed the incense from the display and ordered her employees to stop selling it. (Tr. 94, 112). The next day, however, she began selling the incense again after speaking to an attorney. On March 8, 2013, Attorney Nichelson wrote a letter to the prosecutor, stating that Shadyside Party Center provided samples of the products to a named officer on the Belmont County Drug Task Force. The letter then stated: "the Drug Task Force has not identified any product from the samples provided that has an illegal substance content. This would be very helpful to know. Please ask the Drug Task Force to provide the test reports that identify any illegal substance that has been found to be contained in the samples provided by the Shadyside Party Center."

**{¶9}** On March 13, 2013, the undercover agent returned to the store. The employees informed him that a packet of "Purple Haze" was priced at $20 and a packet of "OMG" was priced at $25. He bought four three-gram packets of "Purple Haze" and five four-gram packets of "OMG." They charged him $250 (suggesting that they did not use a cash register as the total should have been $205). The "OMG" packet stated that it contained next generation herbal potpourri, claimed that it was not for human consumption, provided a list of illegal substances that it does not contain, stated that it does not contain any DEA banned substances, and encouraged, "Stroke the furry bag." The agent submitted the products to BCI for testing. All 9 packets tested positive for XLR11 as did the two purchased on March 4, 2013. A search

warrant was immediately obtained and executed on March 20, 2013, during which the inventory of incense was seized.

{¶10} Stacey Heathcote testified that she started selling the incense in the summer of 2012. (Tr. 80, 113). Her customers asked for the product and a cigarette vendor offered the product; she later switched vendors when she found a cheaper price. (Tr. 80-81, 114). When asked what her employee meant when she testified that the products were the "talk of the town," Ms. Heathcote replied that it was the "talk of every town" that people were smoking the incense. (Tr. 102). Still, she insisted that until that search warrant was executed, she had no reason to believe the products contained an illegal drug. (Tr. 95).

{¶11} Ms. Heathcote stated that she charged sales tax on the products, her register kept track, and the total after tax was an even dollar amount. (Tr. 115-116). She disclosed that the herbal incense generated $2,000-$3,000 per week in sales. (Tr. 83, 100). She claimed that her price mark-up was not greater for herbal incense than for many other products, testifying that her mark-up on real incense was 20-50%. (Tr. 104). Her manager confirmed they sold incense burners and candles, some of which cost more than $20. (Tr. 61). Although Ms. Heathcote initially estimated her mark-up on the illegal product was 20-25%, she also provided examples that put the mark-up at approximately 90%. (Tr. 82, 100).

{¶12} Ms. Heathcote explained that every shipment arrived with a laboratory report from the supplier (or producer). A February 2012 report stated that the sample had been compared to 39 compounds for possible matches in order to detect synthetic cannabinoids. The report concluded that the potpourri blend contained none of the listed cannabinoids. Certain substances (added to Ohio's list in 2011) were said to have been tested, but the sample was not tested for XLR11 (which Ohio specifically added to schedule I on December 20, 2012). Other reports from January 23, 2013 also did involve testing for XLR11.

{¶13} Ms. Heathcote and an employee testified that in connection with the investigation of a complaint from Monroe County, the Shadyside police officer asked her for samples of her products so that he would not have to request buy money. (Tr.

38, 85-86). Later that day, she put samples in a bag, typed up an inventory list, and brought it to him at the police station. (Tr. 86). She said he mentioned that BCI testing is slow and she was never provided with the results. (Tr. 87-88). She mentioned that this officer investigated a December 2012 burglary at her store, during which cigarettes and incense packets were stolen. (Tr. 88).

{¶14} Ms. Heathcote stated that she was law-abiding and noted that she had just raised $2,000 for the police department by selling candy so they could match grant money. (Tr. 91-92). She explained that her attorney decided to respond to the letter received from the prosecutor on March 7, 2012 by asking for the test results on the products provided to the officer some months prior. She said that her attorney advised her that until she had evidence from the lab saying it was illegal, she was not doing anything wrong. (Tr. 95). Her manager also testified that the attorney advised that he did not see a problem with continuing to sell the product. (Tr. 52).

{¶15} Attorney Nichelson testified that Ms. Heathcote called him when she began selling the product as she wanted to ensure she was selling a legal product. (Tr. 64). She told him about the lab reports provided by the supplier and the labels claiming they were legal. (Tr. 65). The attorney testified that he did not say that she could sell the product but rather advised that she needed to make sure they did not contain an illegal drug. (Tr. 65-66). When she contacted him about the prosecutor's letter, he drafted the reply. (Tr. 67). He believed that she was going to continue to sell the products until she received evidence of illegality. He testified that he advised her that she had to be very sure that there was nothing in the products and that until she got test results, she would not be sure. (Tr. 69). He testified that he knew the law was changed in December of 2012 to add certain synthetic names to the schedule but he did not know what the products being sold at Shadyside contained. (Tr. 75-77).

{¶16} The mayor was subpoenaed by the defense, and he testified that the products were behind glass and were not hidden. (Tr. 33). Prior to this, he had never known this storeowner to violate the law. (Tr. 34). Defense counsel was permitted to add in closing that the incense packets were on display in the same glass case as incense oils and burners. (Tr. 124-125). He also noted that the herbal incense is

often produced by criminals in Africa who spray synthetic chemicals onto vegetation and then trick people into thinking the products are legal. (Tr. 128).

{¶17} On September 9, 2013, the trial court issued a decision finding by clear and convincing evidence that the defendants committed and participated in committing felony drug trafficking violations of R.C. 2925.03 and were thus liable for maintaining a nuisance under R.C. 3719.10.[1] The court further found that the nuisance was subject to abatement. The court found that Ms. Heathcote was aware of the nature of the products considering the totality of the circumstances: police informed her they may be illegal, she knew people were smoking the products even though the packets said not to, the disparity in price, the volume of sales, the uncommon practice of a supplier providing a lab report testing for illegal substances, the explicit warning letter from the prosecutor that the labels on these products about legality are almost always false, the letter immediately caused her to remove the products, and then she decided "on second thought" to try to keep selling the products by hiding behind her lawyer's alleged advice (also finding that even the alleged advice did not dispel her awareness that circumstances probably exist that the product was illegal).

{¶18} The court permanently enjoined the defendants from maintaining a nuisance in the state by selling controlled substances such as "incense" and "potpourri." The court ruled that Shadyside Party Center shall be closed for any purpose and remain closed for a period of one year unless sooner released. The court also ordered the forfeiture of all personal property and contents used in conducting and maintaining the nuisance (said to be all personal property and contents confiscated by law enforcement). Upon a request for clarification by the defense, a September 19, 2013 entry signed by the court and both attorneys stated that the forfeiture applied to the personalty, including $9,010 in cash, confiscated from the

---

[1] The court also found a public nuisance under R.C. 4729.35 due to violations of R.C. 2925.03, described by the court as a law controlling the distribution of a drug of abuse. *See* R.C. 4729.35 ("The violation by a pharmacist or other person of any laws of Ohio * * * controlling the distribution of a drug of abuse as * * * is hereby declared to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance."). The same procedure applies to either type of nuisance. *See* R.C. 3767.01(C)(1).

store and to the incense packets no matter where they were found but would not apply to personal property seized from the residence.

{¶19} The defendants filed a timely notice of appeal. The trial court granted a stay pending appeal upon the posting of a $50,000 bond. This appeal was originally consolidated with *State of Ohio ex rel. Michael DeWine, Attorney General of Ohio v. Fred's Party Centers Inc.*, 7th Dist. No. 13BE29. However, the appeals have been deconsolidated due to the fact that these were different trials before different judges with different facts and *Fred's* presents evidentiary issues not present in *Shadyside*.

### INTRODUCTION

{¶20} XLR11 is a synthetic cannabinoid laced on plant material and promoted as an herbal incense product but which is smoked for psychoactive effects. XLR11 was specifically added to the schedule I controlled substance list under the category for hallucinogens on December 20, 2012.[2] Trafficking in a schedule I controlled substance or a controlled substance analog is a felony. *See* R.C. 2925.03.

{¶21} Premises or real estate on which a felony violation of Chapter 2925 or 3719 occurs constitutes a nuisance subject to abatement pursuant to Chapter 3767. See R.C. 3719.10. *See also* R.C. 3767.01(C)(1) (a nuisance includes that which is defined and declared by statute to be a nuisance). Pursuant to R.C. 3767.02 (A), any person who uses, occupies, establishes, or conducts a nuisance, or aids or abets in the use, occupancy, establishment, or conduct of a nuisance; the owner, agent, or lessee of an interest in any such nuisance; any person who is employed in that nuisance by that owner, agent, or lessee; and any person who is in control of that

---

[2]Before this, various synthetic substances had been added to the list that were being sold on the streets as Spice, K2, or bath salts and controlled substance analogs were defined and treated as schedule I controlled substances. *See* R.C. 3719.01(HH)(1) with (a) (providing a "substantially similar" chemical structure test for proving a controlled substance analog); R.C. 3719.013 (treated as a schedule I substance if intended for human consumption); R.C. 3719.41(C)(35) (adding JWH-018). See also Intent of Amendments, effective Oct. 17, 2011. A major purpose of controlled substance analog laws is to prohibit innovative drugs not yet scheduled as controlled substances. *See U.S. v. Washam*, 312 F.3d 926 (8th Cir.2002). Manufacturers change a molecule in a substance and claim it is legal until the government has the time to classify and schedule the new substance. It is considered difficult to prosecute for selling a substance that is not specifically scheduled due to need for complex scientific testimony needed to prove an analog. In various federal criminal cases, the DEA is urging that XLR11 is a controlled substance analog of JWH-018 and thus illegal even prior to scheduling.

nuisance is guilty of maintaining a nuisance and shall be enjoined as provided in R.C 3767.03 to 3767.11.

{¶22} When a nuisance exists, the attorney general can bring an action in equity in the name of the state upon the relation of the attorney general. *See* R.C. 3767.03. At the hearing, evidence on the general reputation of the place where the nuisance is alleged to exist is prima facie evidence of the nuisance and of knowledge of and acquiescence and participation in the nuisance on the part of the person charged with maintaining it. R.C. 3767.05(A). If the existence of the nuisance is established, a judgment shall be entered that perpetually enjoins the maintenance of the nuisance at the place complained of. R.C. 3767.05(D) (and elsewhere by that defendant).

{¶23} Pursuant to R.C. 3767.06(A), if the existence of a nuisance is established, an order of abatement shall be included in the judgment entry under R.C. 3767.05(D). The order shall direct the removal from the place where the nuisance is found to exist all personal property and contents used in conducting or maintaining the nuisance and the sale of such property belonging to a defendant who was notified or who appeared. R.C. 3767.06(A). If a closing order was not issued earlier, the court shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released. *Id.* The owner of any place closed and not released under bond may appear and obtain a release in the manner and on fulfilling the requirements provided in R.C. 3767.04 (allowing release from closure upon paying costs incurred and providing bond in the full amount of the property value if the court is satisfied of the owner's good faith on keeping the nuisance abated). *Id.*

<u>ASSIGNMENT OF ERROR</u>

{¶24} Appellant's sole assignment of error provides:

{¶25} "The Trial Court Erred When [The Court] Ordered that Shadyside Party Center Be Closed for a Period of One Year."

{¶26} Appellant specifically does not contest that the packets contained the schedule 1 controlled substance of XLR11 or that the court properly found that there

was a nuisance on the premises. Rather, appellant contests the abatement order on various grounds dealing with the application of the portion of R.C. 3767.06 stating that the court shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released. R.C. 3767.06(A). The application of this statute has been amended by Supreme Court ruling as to certain defendants.

**{¶27}** In *Rezcallah,* the owners had tenants or trespassers who committed drug offenses. The Court pointed out that a nuisance had been established as defined in R.C. 3719.10 (felony violation of Chapter 2925 occurs on premises) because there is no requirement of knowledge, acquiescence, or participation on the part of the property owner in order to deem the property a nuisance and find the owner guilty of the civil offense of maintaining a nuisance. *State ex rel. Pizza v. Rezcallah*, 84 Ohio St.3d 116, 122, 702 N.E.2d 81 (1998). The Court noted that the statute clearly provides that the closure order in such case is mandatory. *Id.* at 123. The Court also noted that even though the nuisance action was an action in equity, the statutory injunction must issue without regard to traditional equitable considerations. *Id.* at 127 (acknowledging that the law leaves no judicial discretion as to the closure order).

**{¶28}** The Court held, however, that as applied to defendants who bear no culpable responsibility in the nature of acquiescence or participation in the creation of the nuisance, the mandatory closure requirement is unconstitutional (even with the opportunity for bond). *Id.* at 124. But, the ruling dealt only with those who lacked culpability in the creation or perpetuation of a nuisance. *Id.* at 132. The Court concluded that if the owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, *and* took prompt action to abate the nuisance, then no closure order shall be issued. *Id.*

**{¶29}** Before delving into this exception, appellant presses for the application of the unclean hands maxim that one who seeks equity must do equity. *See Basil v. Vincello*, 50 Ohio St.3d 185, 190, 553 N.E.2d 602 (1990). This doctrine requires that the party invoking equity "not be guilty of reprehensible conduct" regarding the subject matter of the suit. *Id.*

**{¶30}** The Ohio Supreme Court previously considered whether traditional concepts for the issuance of equity injunctions apply in a statutory injunction action. *Ackerman v. Tri-City Geriatric & Health Care, Inc.*, 55 Ohio St.2d 51, 378 N.E.2d 145 (1978). The Court stated that where the statutory conditions exist, the traditional equity principles are not also applicable and the party requesting an injunction is not bound by the rules of equity. *Id.* at 56-57. The Court pointed out that statutory actions granting governmental agents the right to seek injunctive relief have a history and purpose different from equitable actions for injunctive relief. *Id.* at 57 (statutory injunction to benefit society by proscribing behavior which the legislature finds is against the public interest).

**{¶31}** Thus, the Court found it inappropriate to "require the Director of Health to do equity" (have clean hands) in a statutory injunction action against a nursing home operator because such injunctions "and similar injunctions which authorize a governmental agent to sue to enjoin activities deemed harmful by the General Assembly are not designed primarily to do justice to the parties but to prevent harm to the general public." *Id.* The Court reasoned that permitting the party to continue operating an unlicensed home which violates essential requirements for licensing merely "because the Director has been slow to grant or deny appellee a license may balance the equities between the Director and appellee, but it ignores the legislative purpose behind the granting of such relief to protect the well being of those who reside in nursing homes." *Id.* at 57-58.

**{¶32}** Later, in a nuisance abatement action under the statutes at issue in this case, the Supreme Court stated that a nuisance abatement action is an equitable action and concluded: "Nuisance abatement actions seek injunctive relief and, as such, are governed by the same equitable principles that apply to injunction actions generally." *See State ex rel. Miller v. Anthony*, 72 Ohio St.3d 132, 136, 647 N.E.2d 1368 (1995). Appellant suggests that this means that he can raise the equitable defense of unclean hands here. However, the *Anthony* holding was made in the context of ruling that there is no right to a jury trial in this type of nuisance action. *Id.*

**{¶33}** And more recently, in the context of the very nuisance statutes at issue herein, the Court cited its prior *Ackerman* holding that *it is inappropriate to* balance the equities *or require the state to do equity* in a statutory injunction action, noting that the authorization for the government agent to enjoin harmful activities is not designed to ensure justice for the parties but to protect the public. *Rezcallah*, 84 Ohio St.3d 116 (applying the *Ackerman* holding, that the statutory injunction should issue if the statutory requirements are fulfilled, to a nuisance abatement case). Thus, the unclean hands doctrine was not a consideration for the trial court in this case.

**{¶34}** In any event, unclean hands in the form of reprehensible conduct can be judged as lacking here. For instance, appellant focuses on Ms. Heathcote's submission of the products to an officer in Shadyside and argues that the failure to test or report back to her on those products represented unclean hands. The officer testified that he gave the samples to the assistant chief of police with the belief they would be tested, but he did not know the status. The defense did not conduct discovery on the matter or call others to testify as to whether those samples were tested and if not, why not.

**{¶35}** In fact, a higher police official could rationally realize that they should not rely on samples volunteered by the very person alleged to have been selling illegal products. And, a police department need not use its submission authority to have BCI essentially conduct free testing for local businesses. Additionally, at the time the owner submitted the samples, XLR11 had not yet been specifically added to the controlled substance list. Thereafter, any testing would have been on a product which may no longer represent the products on the shelves. They thus conducted controlled buys to establish what was being sold on March 4, 2013 and again on March 13, 2013, after the prosecutor's March 6 letter.

**{¶36}** Appellant complains that if the drug task force had provided her with the test results on the products, the store would have stopped selling the products before the day the search warrant was executed. However, police need not tell a business that they are about to execute a search warrant based on test results that controlled undercover buys contained a controlled substance, and police need not provide lab

reports to a business prior to filing a nuisance complaint. Moreover, the prosecutor's letter warned the business to cease selling the products and explained that most if not all of the packets contained illegal substances regardless of what the labels claimed. Especially after this letter, it cannot be said that law enforcement permitted the nuisance to exist.

{¶37} In point of fact, Ms. Heathcote states that she immediately removed the products from the shelves upon receiving the letter. She then put them back after having an attorney send a letter asking the prosecutor to ask the task force to provide the test reports on the substances provided to the Shadyside officer months earlier. Notably, the Shadyside officer testified that when Ms. Heathcote gave him the substances for testing, he warned her that there could be a pending investigation from another agency and if the substances tested positive, she could still be arrested for trafficking. (Tr. 27-28). Appellant's unclean hands argument lacks merit as there was no showing of reprehensible conduct, and as aforestated, the doctrine is inapplicable in any event.

{¶38} Next, appellant argues that the closure order should not have issued because the store and its owner acted in good faith and promptly rectified the issue. Appellant relies on paragraph two of the *Rezcallah* syllabus, which states that R.C. 3767.06(A) requires a trial court, upon the finding of nuisance, to issue an injunction closing the property against its use but that to the extent that it allows release only through a bond in the amount of the full property value, the statute violates the constitution when applied to an owner who did not negligently or knowingly acquiesce to and did not participate in the creation or perpetuation of the nuisance. *Rezcallah.* 84 Ohio St.3d 116 at ¶ 2 of syllabus. *Compare* R.C. 3767.04 (good faith required for posting a bond to reopen deals with the belief that the nuisance will remain abated).

{¶39} The state urges that appellant did not act in good faith but rather participated in and acquiesced in the nuisance, turning a "blind-eye" to the illegality in order to make as much money as possible until a positive test result was returned by a government lab. The state disparages the reliance on odd lab reports from the supplier and statements of legality on the labels, characterizing this as appellant's

mere belief that they had "insurance" against liability being imposed upon them if law enforcement discovered any newly scheduled controlled substances in the packets.

**{¶40}** Appellant compares the situation before us to *State ex rel. Allen Cty. Prosecutor v. Howard*, 3d Dist. No. 1-11-33, 2012-Ohio-404. That case merely refused to reverse a trial court's decision on the owners' lack of acquiescence and refused to adopt the prosecutor's argument that acquiescence existed as a matter of law. *See id.* at ¶ 39-40 (owners evicted sons upon discovering they were selling drugs from apartment attached to the market, terminated one son's employment, began to work at the market all day themselves, closed the market earlier to diminish drug activity around the market, called police over fifty times to curb the drug activity near the market, and told drug dealers to leave the area on multiple occasions.)

**{¶41}** Appellant also compares the situation to *State ex rel. Cleveland Dir. of Law v. Alahmad*, 8th Dist. No. 86447, 2006-Ohio-804. But, that case also dealt with a court's refusal to reverse a trial court's decision that the city did not demonstrate that the owner acquiesced to or participated in the drug law violations occurring at the premises. *See id.* at ¶ 40 (owner hired a security guard to remove loiterers, instructed his employees to ask loiterers to leave and to report drug trafficking to the police, repeatedly called the police to report illegal drug activity, ordered a new lighted canopy, and repositioned security cameras to photograph the parking lot).

**{¶42}** The trial court here found by clear and convincing evidence that appellant committed and participated in the felony violations of the drug trafficking statute and had knowledge of the illegal substance. The court noted that knowledge of the circumstances exist when one is aware that such circumstances probably exist. *See* R.C. 2901.22.

**{¶43}** This is not a case involving a property owner who was not the seller of the drugs. Appellant was the seller who did a brisk trade in the substance at a highly inflated price. The packets had suspicious labeling regarding their legality and arrived with lab reports claiming that tests had been run for various synthetic cannabinoids. The reports did not claim a test had been conducted for XLR11. Appellant knew

people smoked the substance even though the products were labeled as "not for human consumption."

**{¶44}** Appellant had been informed that the local police and non-local police were concerned that the products being sold from the store were illegal. Moreover, she then received a letter from the prosecutor regarding the illegality of the products. This letter was delivered two and one-half months after XLR11 was specifically added to the list of controlled substances. And, there is no grace period (even in criminal cases). *See, e.g., State v. Adams*, 12th Dist. No. CA2012-011-240, 2013-Ohio-4639, ¶14-15 (possession of bath salts three weeks after added to list). The letter disclosed that the Belmont County Drug Task Force informed the prosecutor "that you may be selling synthetic marijuana, incense, and/or bath salts that are being smoked or ingested by your patrons. Despite what the labels on these packages provide, that they do not contain illegal substances, most if not all of these products do contain illegal substances."

**{¶45}** The prosecutor urged appellant "to cease selling these items immediately and remove all of them from your store" and warned that the failure to remove the product and immediately cease selling it could lead to criminal prosecution for felony drug trafficking. The prosecutor again stated that the letter was sent "[s]o you will know that the bath salts, incense and/or synthetic marijuana that you have in your store should not be sold. That they should immediately be removed from your shelves with no further sales occurring."

**{¶46}** Appellant initially removed the products from the shelves and ordered the employees to stop selling the products. Thus, the letter was not as vague as appellant now argues. Then, after having an attorney write a letter asking for the lab results from the samples provided to the Shadyside officer, she kept selling the products. This is even though she had been warned by a police officer that if the products tested positive, she could be arrested for drug trafficking. Under the totality of the circumstances, a lack of culpability under the *Rezcallah* case is not a legal question that can be answered in appellant's favor with no deference to the trial court (as appellant suggests).

{¶47} The trial court concluded that the defendants participated in and committed the felony violations and were aware that the products were illegal. Although appellant believes it is not, the matter here is one of weight, credibility, and rational inferences. Appellant's argument on good faith in relation to the necessity of a closure order essentially asks us to find that the trial court's decision was against the weight of the evidence on the issue of whether this case involved an "***owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance***." *Rezcallah.* 84 Ohio St.3d 116 at ¶ 2 of syllabus (emphasis added). *See also id.* at 94 (no closure if "owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance.").

{¶48} A rational fact-finder could conclude that appellant's situation was not similar to the defendants' situation in *Rezcallah* and does not fit the test set forth therein. The judge could rationally conclude that instead of complying with the prosecutor's request, appellant decided to gamble on the supplier's assertions that none of the packets contained illegal substances, assertions that could be considered highly suspect under the totality of the circumstances. Likewise, a fact-finder could conclude that appellant decided to gamble that liability would not be imposed (appellant would not be blamed) due to the claimed reliance on the supplier's lab reports and the willingness to have the product tested, i.e. appellant wanted to keep selling and making money pending an official lab report hoping that ignorance of an actual positive test provided protection.[3]

{¶49} Where the evidence is susceptible of more than one reasonable construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, citing *Seasons Coal Co., Inc. v.*

---

[3]But, a suggestion you will stop selling it if you are shown tests displaying an illegal substance does not mean a crime was not committed in the meantime. And, the continual race to stay ahead of controlled substance schedules reduces the rationality of reliance on such a letter as well, i.e., the letter can be seen as an attempt to entangle the prosecutor in a cycle of selling, demanding a stoppage, requesting testing, testing, stopping, selling a new formula, etc., etc.

*Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3. The trial judge was in the best position to weigh the credibility of those testifying, including Ms. Heathcote, and make rational inferences regarding the evidence and the testimony. In conducting our review of that decision, we conclude that the trial judge did not clearly lose the way in resolving conflicts in the evidence and create a manifest miscarriage of justice. *See Eastley*, 132 Ohio St.3d 328 at ¶ 17, 20.

**{¶50}** Appellant also asserts here that by not continuing to sell drugs after the search warrant was executed, there was no nuisance to abate by the time of the hearing, citing the general rule of equity that a court does not issue an injunction to solve a problem that ceases to exist. As aforementioned, the traditional equitable principles do not apply when the statutory injunction is required by its terms. If appellant was not an owner that fit under the *Rezcallah* test, then the trial court had a mandatory statutory duty to order the closure after finding a nuisance regardless of whether the drug sales were still occurring at the time of the complaint or the time of trial. *See State ex rel. Miller v. Anthony*, 72 Ohio St.3d 132, 647 N.E.2d 1368 (1995) (felony drug violations need not be occurring at time of complaint or time of hearing in a case where owner was the seller). *See also Rezcallah.* 84 Ohio St.3d at 123-124.

**{¶51}** Appellant next states that a court issuing an abatement order must narrowly tailor it to address only the nuisance. Appellant claims that the order was overbroad because the court ordered the store closed "for any purpose" for one year unless sooner released, citing and distinguishing *State ex rel. Rothal v. Smith,* 151 Ohio App.3d 289, 2002-Ohio-7328, 783 N.E.2d 1001 (9th Dist.) and *State ex rel. Roszmann v. Lions Den*, 89 Ohio App.3d 775, 627 N.E.2d 629 (12th Dist.1993).

**{¶52}** In the latter case, the appellate court addressed an argument that the trial court should have narrowly tailored the closure order and found that the trial court could close an adult bookstore because prohibiting only lewd behavior would not work where the patrons only frequented the business to engage in such behavior. *Roszmann*, 89 Ohio App.3d at 776. Appellant believes this means the permanent injunction abatement order here must be narrowly tailored and points out that, contrary to the situation in *Roszmann*, patrons did not only come to the premises for the

nuisance activity. However, the argument there was that the trial court was not permitted to close the store "for any purpose" *at the temporary injunction stage* of the proceedings due to the following language of R.C. 3767.04(B)(3) dealing with that stage: "the court or judge forthwith shall issue an order closing the place against its use for any purpose of lewdness, assignation, prostitution, or other prohibited conduct until a final decision is rendered on the complaint for the requested permanent injunction." *Id.*

**{¶53}** Similarly, most of the pertinent portion of *Rothal* deals with this statutory provision for the temporary injunction stage. *Rothal v. Smith,* 151 Ohio App.3d 289, ¶ 100-106 ("we fail to understand how an order requiring the prohibited and lewd conduct in the bar to cease yet allowing the bar to operate would effectuate the intent of the temporary injunction."). *Id.* at ¶106. As one of the defendants seemed to be applying his argument to the permanent closure order as well, the court then cited to R.C. 3767.06(A), which states that the *prior closure order* shall continue for one year. *Id.* at ¶ 102, 107.

**{¶54}** Here, a temporary order was not issued, and the provision in R.C. 3767.04(B)(3) never arose. Rather, as discussed above, the applicable statute mandated this abatement order to "include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released" (unless the exception created by *Rezcallah* applies in which case no closure could occur at all). *See* R.C. 3767.06(A). As such, the argument on narrowly tailoring the order to delete the statutorily-required language "for any purpose" is without merit as the trial court could not tailor the order to eliminate that phrase. Appellant cannot avoid the statute (as modified by *Rezcallah* for certain defendants) by this argument.

**{¶55}** Finally, appellant points to the language of R.C. 3767.06(A) providing that "[t]he order shall direct the removal from the place where the nuisance is found to exist of all personal property and contents used in conducting or maintaining the nuisance and not already released" under R.C. 3767.04(C) and order the property sold. The court ordered: "all personal property and contents used in conducting or

maintaining the nuisance (all personal property and contents confiscated by law enforcement authorities) shall be forfeited * * *."

**{¶56}** The defense asked the trial court for clarification of the forfeiture order, stating that it should apply to the products and may also apply to the $9,010 in cash seized from the store but should not apply to the 17 guns or the $65,000 in cash seized from Ms. Heathcote's attached residence, stating that the money was not related to the illegal products but was mostly rental income and some was the property of her roommate. A September 19, 2013 entry (signed by the court and the attorneys) stated that the forfeiture applies to the personal property and the $9,010 confiscated from the store but would not apply to the personal property seized from the residence (except that all incense packets were forfeited no matter where they were found).

**{¶57}** In a three-sentence argument, appellant contends that the forfeiture order was too broad because the statute only permits forfeiture of personal property and contents used in conducting the nuisance, the store is "a large business establishment that sold many products other than the incense and potpourri," and the court ordered all of the personal property and contents of the party centers forfeited as opposed to only the personal property and contents used in selling the illegal products. Appellant's Brief 15, citing *Roszmann*, 89 Ohio App.3d at 780-781.

**{¶58}** In the Twelfth District case appellant relies upon and distinguishes, the trial court ordered the sale of "all personal property located at the Interstate Adult Arcade including, but not limited to, all video cassette recorders, all television monitors, all booths, all wiring and any and all other personal property used in the conduct and maintenance of the nuisance." *Roszmann*, 89 Ohio App.3d at 780. The defendant argued that the state failed to prove that the forfeited property was used in the nuisance. *Id.* The appellate court disagreed because the equipment specifically identified by the court was used in conducting the nuisance *and the defendant failed to identify any other items removed from the store which were not used in conducting or maintaining the nuisance.* *Id.* at 780-781 (noting that soda, snack, and pinball machines were returned to the appellant during the temporary stage).

**{¶59}** Here, appellant does not identify what seized items should not have been subject to forfeiture. *Accord id.* at 780-781. Instead, appellant seems to misconstrue the court's order as requiring all contents of the business removed. Contrary to appellant's argument, the court's entry did not order the forfeiture of "all of the personal property and contents of the business." (Appellant's Brief at 15.) Rather, the trial court ordered the forfeiture of "all personal property and contents used in conducting or maintaining the nuisance" and defined that as "all personal property and contents confiscated by law enforcement authorities" (except the items from the residence). There is no indication that all of the business's personalty and contents had been seized by law enforcement. (The business continued to operate and still does under the trial court's stay pending appeal, and no request to release any items was made.) The motion for clarification made it appear there was no dispute on the matter except as to the money and guns from the residence, agreeing that all packets and the money from the store could be forfeited. Besides this money from the store, the drugs, and some documents (such as the lab reports from the suppliers), the record points to no other items seized. This argument is thus overruled.

**{¶60}** For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, J., concurs.